OPINION OF THE COURT
 

 Titone, J.
 

 In each of these appeals, a divorced spouse who was previ
 
 *732
 
 ously granted custody of the couple’s minor offspring seeks permission to move away from the area in which the noncustodial spouse resides. Both noncustodial spouses oppose the move, contending that it would significantly reduce the access to the children that they now enjoy. Their respective appeals from the Appellate Division order and the Family Court judgment authorizing the requested moves raise significant questions regarding the scope and nature of the inquiry that should be made in cases where a custodial parent proposes to relocate and seeks judicial approval of the relocation plan.
 

 L
 

 Matter of Tropea v Tropea
 

 The parties in this case were married in 1981 and have two children, one born in 1985 and the other in 1988. They were divorced in 1992 pursuant to a judgment that incorporated their previously executed separation agreement. Under that agreement, petitioner mother, who had previously been the children’s primary caregiver, was to have sole custody of the children and respondent father was granted visitation on holidays and "at least three * * * days of each week.” Additionally, the parties were barred from relocating outside of Onondaga County, where both resided, without prior judicial approval.
 

 On June 3, 1993, petitioner brought this proceeding seeking changes in the visitation arrangements and permission to relocate with the children to the Schenectady area. Respondent opposed the requested relief and filed a cross petition for a change of custody. At the ensuing hearing, petitioner testified that she wanted to move because of her plans to marry an architect who had an established firm in Schenectady. According to petitioner, she and her fiancé had already purchased a home in the Schenectady area for themselves and the Tropea children and were now expecting a child of their own. Petitioner stated that she was willing to cooperate in a liberal visitation schedule that would afford respondent frequent and extended contact and that she was prepared to drive the children to and from their father’s Syracuse home, which is about two and a half hours away from Schenectady. Nonetheless, as all parties recognized, the distance between the two homes made midweek visits during the school term impossible.
 

 Respondent took the position that petitioner’s "need” to move was really the product of her own life-style choice and
 
 *733
 
 that, consequently, he should not be the parent who is "punished” with the loss of proximity and weekday contact. Instead, respondent proposed that he be awarded custody of the children if petitioner chose to relocate. To support this proposal, respondent adduced evidence to show that he had maintained frequent and consistent contact with his children at least until June of 1993, when the instant proceeding was commenced. He had coached the children’s football and baseball teams, participated in their religion classes and had become involved with his older son’s academic education during the 1992-1993 school year. However, there was also evidence that respondent harbored a continuing bitterness toward petitioner which he had verbalized and demonstrated to the children in a number of inappropriate ways. Respondent admitted being bitter enough to have called petitioner "a tramp” and "a low-life” in the children’s presence and, in fact, stated that he saw nothing wrong with this conduct, although he acknowledged that it had a negative effect on the children. Respondent’s mother confirmed that he had spoken negatively about petitioner in the children’s presence and that this behavior had not been helpful to the children.
 

 Following the hearing, the presiding Judicial Hearing Officer (JHO) denied petitioner’s request for permission to relocate. Applying what he characterized as "a more restrictive view of relocation,” the JHO opined that whenever a proposed move "unduly disrupts or substantially impairs the [noncustodial parent’s] access rights to [the] children,” the custodial spouse seeking judicial consent must bear the burden of demonstrating "exceptional circumstances” such as a "concrete economic necessity.” Applying this principle to the evidence before him, the JHO found that petitioner’s desire to obtain a "fresh start” with a new family was insufficient to justify a move that would "significantly impact upon” the close and consistent relationship with his children that respondent had previously enjoyed.
 

 On petitioner’s appeal, however, the Appellate Division reversed, holding that petitioner had made the necessary showing that the requested relocation would not deprive respondent of "regular and meaningful access to his children.” (212 AD2d 1050.) Further, the Court noted, petitioner’s proposed visitation schedule afforded respondent the opportunity for frequent and extended contact with his children. Finally, the Court found that the move would be in the best interests of the children. Accordingly, the Court ruled that petitioner should be
 
 *734
 
 permitted to move to Schenectady and remitted the matter to Family Court for the establishment of an appropriate visitation schedule. The final Family Court judgment from which respondent appeals awards respondent substantial weekend, summer and vacation visitation in accordance with the Law Guardian’s recommended schedule.
 
 [1]
 

 Matter of Browner v Ken-ward
 

 The parties to this proceeding were married in August of 1983 and had a son three years later. After marital discord led the parties to separate, they executed a stipulation of settlement and agreement in January of 1992 which gave petitioner mother physical custody of the couple’s child and gave respondent father liberal visitation, including midweek overnight visits and alternating weekends. Under the stipulation, respondent was to remain in the marital residence, which was located in "White Plains, New York, and petitioner and the parties’ son were to live with petitioner’s parents in nearby Purchase. Petitioner was required to seek prior approval of the court if she intended to move more than 35 miles from respondent’s residence. The stipulation was incorporated but not merged in the parties’ divorce judgment, which was entered in June of 1992.
 

 In October of 1992, petitioner brought the present proceeding for permission to relocate with the couple’s child to Pitts-field, Massachusetts, some 130 miles from respondent’s Westchester County home. Petitioner requested this relief because her parents were moving to Pittsfield and she wished to go with them. Respondent opposed the application, contending that he was a committed and involved noncustodial parent and that the proposed move would deprive him of meaningful contact with his son.
 

 A hearing was conducted over a period of several months. The hearing evidence disclosed that petitioner’s parents had been considering moving for some time and had made the final decision to do so in September of 1992, coinciding fairly closely with the loss of petitioner’s job. Petitioner testified that she had tried to find work in New York but was unable to do so. She further testified that her prospects of finding affordable housing in the Purchase area were bleak. She ultimately lo
 
 *735
 
 coted a marketing job in Pittsfield that would give her enough income to rent a home of her own in that area. Petitioner had also investigated the facilities for children in Pittsfield and had found a suitable school and synagogue for her son.
 

 An additional motivating factor for petitioner was the emotional support and child care that she received from her parents and that she expected to receive from her extended family in Pittsfield. According to the evidence, petitioner was somewhat dependent on her parents for financial and moral support, and petitioner’s son had become especially close to his grandparents after his own parents had separated. Further, the boy had a long-standing close relationship with his Pitts-field cousins.
 

 Respondent argued that permission for the move should be denied because it would significantly diminish the quantity and quality of his visits with his child. Respondent noted that the move would eliminate the midweek visits that he had previously enjoyed as well as his opportunity to participate in the child’s daily school, sports and religious activities. Accordingly, respondent argued, petitioner’s proposed relocation to Pitts-field would deprive him of meaningful access to his child.
 

 The Family Court found petitioner’s argument that she was unable to secure employment and new housing within the Westchester area to be less than convincing. The court further found that respondent had been "vigilant” in visiting his son and was "sincerely interested in guiding and nurturing [the] child.” Nonetheless, the court ruled in petitioner’s favor and authorized the proposed move, granting respondent liberal visitation rights. In so ruling, the court noted that the move would not deprive respondent of meaningful contact with his son and that, in light of the psychological evidence that had been adduced, the move would be in the child’s best interests. With respect to the best-interests question, the court stated that the parents’ separation from each other would reduce the bickering that was causing the child difficulty and would enable the child to have the healthy peer relationships that he needed. Additionally, the emotional advantages that petitioner would realize from proximity to her parents would ultimately enhance the child’s emotional well being. On respondent’s appeal, the Appellate Division affirmed, stating only that "the relocation did not deprive [respondent] of regular and meaningful access to the child” and, thus, petitioner was "not required to show exceptional circumstances to justify relocation.” (213 AD2d 400, 401.) This Court subsequently granted respondent leave to appeal.
 

 
 *736
 
 IL
 

 Relocation cases such as the two before us present some of the knottiest and most disturbing problems that our courts are called upon to resolve. In these cases, the interests of a custodial parent who wishes to move away are pitted against those of a noncustodial parent who has a powerful desire to maintain frequent and regular contact with the child. Moreover, the court must weigh the paramount interests of the child, which may or may not be in irreconcilable conflict with those of one or both of the parents.
 

 Because the resolution of relocation disputes is ordinarily a matter entrusted to the fact-finding and discretionary powers of the lower courts, our Court has not had frequent occasion to address the question. We discussed the issue in general terms in
 
 Weiss v Weiss
 
 (52 NY2d 170, 174-175), in which we recognized the importance of continued regular and frequent visitation between the child and the noncustodial parent and stated that "absent exceptional circumstances * * * appropriate provision for visitation or other access by the noncustodial parent follows almost as a matter of course” (citing
 
 Strahl v Strahl,
 
 66 AD2d 571,
 
 affd
 
 49 NY2d 1036). We revisited the area a year later in
 
 Daghir v Daghir
 
 (56 NY2d 938), but the majority memorandum in that case merely commented on the trial court’s failure to separately consider the child’s best interests and did not otherwise elucidate the proper standard to be used in assessing requests by custodial parents for permission to relocate
 
 (see also, Priebe v Priebe,
 
 55 NY2d 997 [upholding Appellate Division’s discretionary determination]).
 

 Since our decisions in
 
 Weiss
 
 and
 
 Daghir,
 
 the lower courts have evolved a series of formulae and presumptions to aid them in making their decisions in these difficult relocation cases. The most commonly used formula involves a three-step analysis that looks first to whether the proposed relocation would deprive the noncustodial parent of "regular and meaningful access to the child”
 
 (e.g., Lavane v Lavane,
 
 201 AD2d 623;
 
 Matter of Lake v Lake,
 
 192 AD2d 751;
 
 Matter of Radford v Propper,
 
 190 AD2d 93;
 
 Matter of Schaefer v Brennan,
 
 170 AD2d 879;
 
 Matter of Cassidy v Kapur,
 
 164 AD2d 513;
 
 Matter of Schouten v Schouten,
 
 155 AD2d 461;
 
 Blundell v Blundell,
 
 150 AD2d 321;
 
 Murphy v Murphy,
 
 145 AD2d 857;
 
 Zaleski v Zaleski,
 
 128 AD2d 865;
 
 Klein v Klein,
 
 93 AD2d 807). Where a disruption of "regular and meaningful access” is not shown, the inquiry is truncated, and the courts generally will not go
 
 *737
 
 on to assess the merits and strength of the custodial parents’ motive for moving
 
 (see, e.g., Matter of Bennett v Bennett,
 
 208 AD2d 1042;
 
 Partridge v Meyerson,
 
 162 AD2d 507;
 
 Matter of Lake v Lake, supra).
 
 On the other hand, where such a disruption is established, a presumption that the move is not in the child’s best interest is invoked and the custodial parent seeking to relocate must demonstrate "exceptional circumstances” to justify the move
 
 (e.g., Matter of Lavelle v Freeman,
 
 181 AD2d 976;
 
 Rybicki v Rybicki,
 
 176 AD2d 867;
 
 Hathaway v Hathaway,
 
 175 AD2d 336). Once that hurdle is overcome, the court will go on to consider the child’s best interests.
 

 The premise underlying this formula is that children can derive an abundance of benefits from "the mature guiding hand and love of a second parent” (Weiss
 
 v Weiss, supra,
 
 at 175;
 
 accord, Matter of Radford v Propper, supra,
 
 at 99) and that, consequently, geographic changes that significantly impair the quantity and quality of parent-child contacts are to be "disfavored”
 
 (see, Matter of Farmer v Dervay,
 
 174 AD2d 857, 858;
 
 Matter of Pasco v Nolen,
 
 154 AD2d 774, 776;
 
 Matter of Towne v Towne,
 
 154 AD2d 766, 767). While this premise has much merit as a tenet of human dynamics, the legal formula that it has spawned is problematic and, in many respects, unsatisfactory
 
 (see,
 
 Miller,
 
 Whatever Happened to the ”Best Interests” Analysis in New York Relocation Cases?,
 
 15 Pace L Rev 339).
 

 One problem with the three-tiered analysis is that it is difficult to apply. The lower courts have not settled on a uniform method of defining "meaningful access”
 
 (compare, Bennett v Bennett, supra,
 
 at 1043 [ability to maintain "close and meaningful relationship with * * * children],
 
 with Matter of Radford v Propper, supra,
 
 at 99 ["frequent and regular access”]), and even the distance of the move has not been a reliable indicator of whether the "meaningful access” test has been satisfied
 
 (compare, Rybicki v Rybicki, supra
 
 [disapproving 84-mile move],
 
 with Matter of Schouten v Schouten,
 
 155 AD2d 461,
 
 supra
 
 [approving 258-mile move];
 
 Murphy v Murphy,
 
 145 AD2d 857,
 
 supra
 
 [approving 340-mile move]).
 

 On a more fundamental level, the three-tiered test is unsatisfactory because it erects artificial barriers to the courts’ consideration of all of the relevant factors. Most moves outside of the noncustodial parent’s locale have some disruptive effect on that parent’s relationship with the child. Yet, if the disruption does not rise to the level of a deprivation of "meaningful access,” the three-tiered analysis would permit it without any
 
 *738
 
 further inquiry into such salient considerations as the custodial parent’s motives, the reasons for the proposed move and the positive or negative impact of the change on the child. Similarly, where the noncustodial parent has managed to overcome the threshold "meaningful access” hurdle, the three-tiered approach requires courts to refuse consent if there are no "exceptional circumstances” to justify the change, again without necessarily considering whether the move would serve the child’s best interests or whether the benefits to the children would outweigh the diminution in access by the noncustodial parent. The distorting effect of such a mechanical approach may be amplified where the courts require a showing of economic necessity or health-related compulsion to establish the requisite "exceptional circumstances”
 
 (see, e.g., Matter of Lavelle v Freeman, supra; Leslie v Leslie,
 
 180 AD2d 620;
 
 Goodwin v Goodwin,
 
 173 AD2d 769;
 
 Coniglio v Coniglio,
 
 170 AD2d 477) or where the demands of a new marriage are summarily rejected as a sufficient basis for satisfying this test
 
 (e.g., Rybicki v Rybicki, supra; Richardson v Howard,
 
 135 AD2d 1140).
 

 In reality, cases in which a custodial parent’s desire to relocate conflicts with the desire of a noncustodial parent to maximize visitation opportunity are simply too complex to be satisfactorily handled within any mechanical, tiered analysis that prevents or interferes with a simultaneous weighing and comparative analysis of all of the relevant facts and circumstances. Although we have recognized and continue to appreciate both the need of the child and the right of the noncustodial parent to have regular and meaningful contact
 
 (see generally, Weiss v Weiss, supra),
 
 we also believe that no single factor should be treated as dispositive or given such disproportionate weight as to predetermine the outcome. There are undoubtedly circumstances in which the loss of midweek or every weekend visits necessitated by a distant move may be devastating to the relationship between the noncustodial parent and the child. However, there are undoubtedly also many cases where less frequent but more extended visits over summers and school vacations would be equally conducive, or perhaps even more conducive, to the maintenance of a close parent-child relationship, since such extended visits give the parties the opportunity to interact in a normalized domestic setting. In any event, given the variety of possible permutations, it is counterproductive to rely on presumptions whose only real value is to simplify what are necessarily extremely complicated inquiries.
 

 Accordingly, rather than endorsing the three-step meaningful access exceptional-circumstance analysis that some of the
 
 *739
 
 lower courts have used in the past, we hold that each relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child. While the respective rights of the custodial and noncustodial parents are unquestionably significant factors that must be considered (see,
 
 Strahl v Strahl,
 
 66 AD2d 571,
 
 affd
 
 49 NY2d 1036,
 
 supra),
 
 it is the rights and needs of the children that must be accorded the greatest weight, since they are innocent victims of their parents’ decision to divorce and are the least equipped to handle the stresses of the changing family situation.
 

 Of course, the impact of the move on the relationship between the child and the noncustodial parent will remain a central concern. Indeed, even where the move would leave the noncustodial parent with what may be considered "meaningful access,” there is still a need to weigh the effect of the quantitative and qualitative losses that naturally will result against such other relevant factors as the custodial parent’s reasons for wanting to relocate and the benefits that the child may enjoy or the harm that may ensue if the move is or is not permitted. Similarly, although economic necessity or a specific health-related concern may present a particularly persuasive ground for permitting the proposed move, other justifications, including the demands of a second marriage and the custodial parent’s opportunity to improve his or her economic situation, may also be valid motives that should not be summarily rejected, at least where the over-all impact on the child would be beneficial. While some courts have suggested that the custodial spouse’s remarriage or wish for a "fresh start” can never suffice to justify a distant move
 
 (see, e.g., Elkus v Elkus,
 
 182 AD2d 45, 48;
 
 Stec v Levindofske,
 
 153 AD2d 310), such a rule overlooks the value for the children that strengthening and stabilizing the new, postdivorce family unit can have in a particular case.
 

 In addition to the custodial parent’s stated reasons for wanting to move and the noncustodial parent’s loss of access, another factor that may well become important in a particular case is the noncustodial parent’s interest in securing custody, as well as the feasibility and desirability of a change in custody. Obviously, where a child’s ties to the noncustodial parent and to the community are so strong as to make a long-distance move undesirable, the availability of a transfer of custody as realistic alternative to forcing the custodial parent to remain
 
 *740
 
 may have a significant impact on the outcome. By the same token, where the custodial parent’s reasons for moving are deemed valid and sound, the court in a proper case might consider the possibility and feasibility of a parallel move by an involved and committed noncustodial parent as an alternative to restricting a custodial parent’s mobility.
 

 Other considerations that may have a bearing in particular cases are the good faith of the parents in requesting or opposing the move, the child’s respective attachments to the custodial and noncustodial parent, the possibility of devising a visitation schedule that will enable the noncustodial parent to maintain a meaningful parent-child relationship, the quality of the life-style that the child would have if the proposed move were permitted or denied, the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships. Of course, any other facts or circumstances that have a bearing on the parties’ situation should be weighed with a view toward minimizing the parents’ discomfort and maximizing the child’s prospects of a stable, comfortable and happy life.
 

 Like Humpty Dumpty, a family, once broken by divorce, cannot be put back together in precisely the same way. The relationship between the parents and the children is necessarily different after a divorce and, accordingly, it may be unrealistic in some cases to try to preserve the noncustodial parent’s accustomed close involvement in the children’s everyday life at the expense of the custodial parent’s efforts to start a new life or to form a new family unit. In some cases, the child’s interests might be better served by fashioning visitation plans that maximize the noncustodial parent’s opportunity to maintain a positive nurturing relationship while enabling the custodial parent, who has the primary child-rearing responsibility, to go forward with his or her life. In any event, it serves neither the interests of the children nor the ends of justice to view relocation cases through the prisms of presumptions and threshold tests that artificially skew the analysis in favor of one outcome or another.
 

 Rather, we hold that, in all cases, the courts should be free to consider and give appropriate weight to all of the factors that may be relevant to the determination. These factors include, but are certainly not limited to each parent’s reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial
 
 *741
 
 parents, the impact of the move on the quantity and quality of the child’s future contact with the noncustodial parent, the degree to which the custodial parent’s and child’s life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child’s best interests.
 
 [2]
 

 ¡IL
 

 Turning finally to the cases before us, we conclude that the orders of the courts below, which approved each of the petitioners’ requests to move, should be upheld. In
 
 Tropea,
 
 petitioner sought permission to relocate from Onondaga County to the Schenectady area so that she could settle into a new home with her fiancé and raise her sons within a new family unit. The Appellate Division found that the move was in the children’s best interest and that the visitation schedule that petitioner proposed would afford respondent frequent and extended visitation.
 
 [3]
 
 We find no reason derived from the record to upset the Appellate Division’s determinations on these points (see,
 
 Daghir v Daghir, supra,
 
 at 940). It is true that the Court considered whether the relocation would deprive respondent of "meaningful access” to his children. However, it is apparent from the remainder of its writing that the Court did not treat that factor as a threshold test barring further inquiry into the salient "best interests” question.
 

 We note that respondent has offered no persuasive legal reason for disturbing the Appellate Division’s finding that the proposed relocation would be in the children’s best interest. Indeed, in this appeal, respondent’s arguments are directed almost entirely to petitioner’s purported "unclean hands” in
 
 *742
 
 developing a relationship with a person she met before the marriage was dissolved and in choosing to marry that individual after her divorce from respondent. As is evident from our earlier discussion, relocation determinations are not to be made as a means of castigating one party for what the other deems personal misconduct, nor are the courts to be used in this context as arbiters of the parties’ respective "guilt” or "innocence.” Children are not chattel, and custody and visitation decisions should be made with a view toward what best serves their interests, not what would reward or penalize a purportedly "innocent” or "blameworthy” parent.
 

 Our analysis in
 
 Browner v Kenward
 
 is somewhat different. The Appellate Division in
 
 Browner
 
 found that the proposed move did not deprive the noncustodial parent of regular and meaningful access to his child and that it was therefore not necessary to weigh the validity and strength of petitioner’s reasons for moving against the significant change in the parent-child relationship that the move would entail. The Court’s methodology was thus at variance with the open-ended balancing analysis that the law requires. However, respondent’s only argument in this Court is that the Appellate Division misapplied the three-tiered
 
 Matter of Radford v Propper (supra)
 
 test to the particular facts of his case. Specifically, respondent argues that the 130-mile move from Westchester County to Pittsfield will eliminate his midweek visitation opportunity, reduce his ability to participate in his son’s religious worship and diminish the quality of the weekend visits he has with his son. While these losses are undoubtedly real and are certainly far from trivial, it cannot be said that they operated to deprive respondent of a meaningful opportunity to maintain a close relationship with his son. Hence, respondent was not entitled to an order reversing the outcome below and denying petitioner the permission to relocate that she sought. We note that the Family Court found that the proposed relocation in
 
 Browner
 
 was in the child’s best interests and the Appellate Division did not disturb that finding.
 

 Accordingly, in
 
 Matter of Tropea v Tropea,
 
 the judgment of the Family Court and the prior nonfinal order of the Appellate Division brought up for review should be affirmed, with costs. In
 
 Matter of Browner v Kenward,
 
 the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 
 *743
 
 In
 
 Matter of Tropea v Tropea:
 
 Judgment of Family Court appealed from and order of the Appellate Division brought up for review affirmed, with costs.
 

 In
 
 Matter of Browner v Kenward:
 
 Order affirmed, with costs.
 

 [2]
 

 . [1] The separation agreements in both
 
 Tropea
 
 and
 
 Browner
 
 require only that the custodial parent apply for judicial approval before moving out of a specified area without making any mention of criteria or standards. A geographical relocation restriction agreed to by the parties and included in their separation agreement might be an additional factor relevant to a court’s best interests determination.
 

 [3]
 

 . Significantly, the Appellate Division’s ruling in this regard did not represent a reversal of any contrary first-level factual finding by the nisi prius court. The Family Court J.H.O. did not reach the best interest question, since, in his view, petitioner’s failure to show “exceptional circumstances” to justify the move obviated the need for further inquiry.