Kellie A.H. v Peter A.H. (2006 NY Slip Op 52131(U))

[*1]

Kellie A.H. v Peter A.H.

2006 NY Slip Op 52131(U) [13 Misc 3d 1235(A)]

Decided on November 10, 2006

Family Court, Suffolk County

Lynaugh, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 10, 2006

Family Court, Suffolk County
Kellie A.H., Petitioner,
against
Peter A.H., Respondent.
V-21577-04/06B/C

Counsel for Petitioner
Phillip J. Jusino, Esq.
2780 Middle Country Road, Suite 312
Lake Grove, New York 11755
Counsel for Respondent
Seth Muraskin, Esq.
1776 Jericho Turnpike, Suite 2
Huntington, New York 11743
Law Guardian
Michael S. Bromberg, Esq.
44 Hampton Street, P.O. Box 2112
Sag Harbor, New York 11963

Barbara Lynaugh, J.
Petitioner-mother and respondent-father each seek to modify an order of this court, dated 11/14/05, which, after hearing, modified a prior judgment and awarded mother custody of the parties' three children, Peter, Jr., born in 1990, Francine, born in 1992, and Theodore, born in 1994. The order also provided father with visitation on alternate weekends, alternate holidays, and vacations.
Father now seeks to modify the order so as to have the children returned to his custody predicated upon mother's relocation to North Carolina. Mother seeks to modify the order so as to allow the relocation with the children. During the pendency of these proceedings, the children have been temporarily residing with [*2]their father as mother has already moved to North Carolina.
Having heard the evidence offered at the hearing, having conducted an in camera interview with the children, and having reviewed the position of the Law Guardian, and with thorough and careful consideration, the court makes the following findings and conclusions.
The court held a lengthy trial in this matter just last year and takes judicial notice of the findings contained within its memorandum decision dated 11/9/05, particularly those findings regarding the parties' respective parenting strengths and weaknesses. Some of those findings are as follows:
"Father started his custodial tenure by bringing a baseless post judgment application to suspend mother's visitation rights. This led to a lengthy, unnecessary, and probably traumatic period of time during which the children were separated from their mother from whose custody they had just been removed. Father was seemingly unaware of the emotional impact his action would have on his already fragile children. This could have been partially responsible for the subsequent problems father has faced in his own relationship with the children.
Father has been unresponsive to the children's medical and academic needs. He minimizes or denies symptoms the children are facing, lies to them about prescription medication, and takes it upon himself to terminate prescribed medication. Father failed to intervene when Peter was failing two important subjects in school and ignored the school's recommendations in this regard.
Father is unable to handle the disciplinary requirements of the children without hurting them. The two youngest children are unhappy living with their father, and the oldest has already left father's home to live with mother following yet another physical altercation.
Mother is not without her own parenting and emotional limitations. However, she has done far more to address these issues than has father. Mother has remained in counseling and has taken a highly relevant and helpful parenting course which has enabled her to gain significant insight into the needs of her children and her role as their parent.
Mother's reasons for wanting custody impressed the court as those of a caring, selfless, and supportive parent. Mother wants custody so that the children can be nurtured, so she can monitor their academics, so she can see to their socialization and keep them from spending "countless hours in front of the television playing video games." Mother also wants custody so the children won't [*3]have to be afraid anymore they won't have to fear being verbally abused and they won't have to fear their father's use of corporal punishment.
Mother is clearly the psychological parent to these children. Even though her relationship with her oldest son has been strained at times, she still loves him and cares about him and will do what is necessary to properly meet his needs. All three children are far more closely bonded emotionally to their mother than they are to their father, who exhibits very little emotional connection to these children."
At the conclusion of the prior proceedings, the court issued an order directing father to complete a parenting class designed to address the issues raised in the court's decision. The court now notes with great distress that father never completed the parenting class he was ordered to attend. He went to just three sessions, dismissively stating that he "did the best that [he] could." Father maintains that he was unaware of what issues he needed to address in a parenting class, although the court's prior decision identified father's parental shortcomings in great detail. It is difficult to understand father's seemingly intransigent lack of insight here as these issues led to the loss of custody of his children.
All three children have various emotional difficulties. Following the transfer of custody in November, 2005, mother worked to address these issues. She had Peter Jr., age 15, attend counseling for his marijuana use and also had him attend an anger management class. His behavior seems to have become less explosive as a result. Mother made sure that Peter attended school and purchased a treadmill to encourage him to get involved in running again. The child joined the school track team in the Spring of 2006.
Theo, age 12, has been diagnosed with Asperger's Syndrome, which mother described as a high-functioning autism. Mother arranged for therapy with Herb L. for Theo. Theo has had what mother described as several "meltdowns" following the change of custody, although the cause of these episodes is unclear. On December 5, 2005, Theo's behavior became increasingly erratic, he threw a heavy dictionary at his sister, and he threatened to hurt himself. Mother brought the child to the psychiatric emergency room at Stony Brook Hospital, where he was evaluated and released. In May 2006, Theo was hospitalized for two weeks at the Brunswick Children's Psychiatric Hospital.
There were many other instances in which Theo's behavior became uncontrollable, and mother called upon father to help with these frequent crises. Father always came to mother's assistance, and removed Theo from mother's home for a "cooling down" period. This type of intervention apparently diffused [*4]these situations and had a calming effect on Theo.
Following the change of custody, both Theo and Peter, Jr., visited with father often and frequently slept at father's home. There was a four or five month period during which Francine, age 14, refused to speak to her father and would not visit with him. That situation improved in May 2006, and the two began visiting regularly at that time.
Although the children have been visiting with father regularly and have been residing with him since mother moved to North Carolina in July, Peter and Francine still do not evince much of an emotional bond with their father. They definitely do not want to continue living with him, even on an interim basis.
The court was unable to determine the level of emotional connection between Theo and father, as the child was not communicative during the interview. It is disturbing to note that when the children came to live with father in July, father abruptly terminated the therapy Theo was receiving with Herb L.. Although custody had not been changed, father felt it was his right to do so, because the child had been left in his care and "possession is two-thirds of the law." Father was ordered to recommence Theo's therapy, and Theo now sees Mr. L. once per week.
When she resided in New York, mother worked in a day treatment center for the developmentally disabled earning $9.13 per hour; her full-time wages were $300 per week. Mother at first stated that she decreased her hours to a part-time schedule in May 2006 because Theo was in the hospital. She later admitted that she had started working part-time in September 2005 because she had Peter with her and she had to do research to prepare for her move to North Carolina. Her part-time wages were $200 per week. Mother had been receiving child support in the amount of $246 per week as of January 2006, but that was reduced to $117 per week when father was laid off. Since May 2006, father has paid child support of $182 per week.
Mother and the children had lived in a two bedroom apartment in East Quogue, the rent for which was $2,000 per month. She exhausted most of her available financial resources maintaining that apartment so the children could remain in the Westhampton School District. After failing to find affordable housing in the district, mother concluded that she could not afford to remain in New York on a long term basis. In November 2005, she purchased land in North [*5]Carolina at a cost of $35,000. She has ordered a three-bedroom Cape Cod modular home to be built on the property at a cost of $126,000. The home has an unfinished upstairs area which mother plans to finish as her own bedroom, giving each of the children their own room.
Mother states that she will be approved for a mortgage and that the home will be ready in just over two months. Mother has taken the children to visit the area of the proposed relocation and even had them select the land which she purchased. Mother admitted that she told the children she wanted to move to North Carolina as early as August 2005.
Mother is currently residing in a leased home in North Carolina. She says that the mortgage on the new home will be $870 per month and the taxes and insurance will be $160 per month. Mother works full-time at Panera Bread earning $300 per week. She says she will be starting a new job at Turning Point, working with the developmentally disabled, earning $440 per week.
Mother was asked whom she would call upon in North Carolina for assistance with Theo's behavior, given the frequency with which she had called upon father in New York for this purpose. Mother stated that she has more support in North Carolina and made reference to a good friend and a neighbor.
Mother has made application for a diagnostic evaluation of Theo at a center which focuses solely on autism; there is a three to four month waiting list. Mother has also registered Theo for a life skills program, which includes counseling. Mother has made inquiry into the special education programs available for Theo in North Carolina. She says that he would be in the same type of program he presently attends in Westhampton.
Should she be allowed to relocate, mother proposes to fly the three children back to New York once per month to visit their father, with her mother driving the children from the airport to father's home.Mother feels that since the children are not closely bonded with their father, that the move would have very little impact on their relationship with him.
Father resides in a large four bedroom, two bath ranch in East Quogue. The children have always resided within a ten-mile radius of their current residence. Their maternal grandmother lives in Center Moriches, their paternal grandparents are nearby, and they frequently see their aunts, uncles, and cousins.
Father opposes the move because regular visitation would not be practical as he would not be able to take enough time off from work. He also feels that the [*6]long distance would necessarily preclude him from participating in the lives of the children on a meaningful level and would render him unable to intervene in a crisis. This is not an insignificant factor, as there have been many serious crises during which mother has needed father's assistance with Theo's behavior.
When deciding whether to allow a proposed relocation, the court must consider and give appropriate weight to all of the relevant factors of an individual dispute. These factors include but are not limited to "each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and the child through suitable visitation arrangements." For a relocation to be allowed, it must be established "by a preponderance of the evidence that a proposed relocation would serve the child's best interests." Tropea v. Tropea, 87 NY2d 727, 642 NYS2d 575 (1996).
As with any determination of custody, the sole concern of the court is which resolution will best serve the interests of the subject child by promoting the child's welfare, happiness, and optimum development. This is true regardless of whether the dispute involves a de novo determination of custody or the modification of either a prior consent decree or a prior adjudication following a plenary hearing. Eschbach v. Eschbach, 56 NY2d 167, 451 NYS2d 658 (1982); Friederwitzer v. Friederwitzer, 55 NY2d 89, 447 NYS2d 893 (1982); Nehra v. Ulhar, 43 NY2d 242, 401 NYS2d 168 (1977).
In a custody modification proceeding, it is not always necessary to show any particular change in circumstances or the existence of any extraordinary circumstances. "Extraordinary circumstances are not a sine qua non of a
change in parental custody of a child, whether the original award of custody
is made after plenary trial or by adoption of the agreement of the parties." Friederweitzer, supra , at 91.
In fact, the court cannot properly make a determination on a custody modification application predicated solely on the lack of a significant change of circumstances since the entry of the earlier order. The court must consider the totality of the circumstances with the best interests of the child being the "critical factor." Morton v. Morton, 158 AD2d 458, 551 NYS2d 51 (2d Dept., 1990).
However, "the party seeking a change of custody bears a heavy burden of [*7]proof that the change contemplated is in the child's best interests. Among the factors or circumstances to be considered in ascertaining the child's best interests are: (1) the continuity and stability of the existing custodial arrangement, including the relative fitness of the parents and the length of time the present custodial arrangement has continued; (2) quality of the child's home environment and that of the parent seeking custody; (3) the ability of each parent to provide for the child's emotional and intellectual development; (4) the financial status and ability of each parent to provide for the child; (5) the individual needs and expressed desires of the child; and (6) the need of the child to live with siblings." Fox v. Fox, 177 AD2d 209, 582 NYS2d 863 (4th Dept., 1992).
In the case at bar, there are many troubling factors giving the court great pause in reaching a proper determination herein. These children have been uprooted repeatedly in the past few years, and mother proposes to do so again. She now wants to move them away from the area in which they have resided their entire lives, albeit an area in which she can no longer afford to live.
It is difficult to predict the impact this move will have on Theo, who is emotionally fragile and behaviorally volatile. Mother has frequently relied upon father when Theo was acting out. Removing Theo from a problem situation apparently has a calming effect on the child.Mother will now have to rely upon the kindnesses of new neighbors and friends to assist her with Theo. To her credit, mother has made arrangements for Theo to receive necessary diagnostic and therapeutic services in her new location.
It is quite disturbing to see the lack of emotional connection that Peter and Francine still have with their father. The court is concerned that the children's impaired relationship with their father will make them reluctant to travel to New York for visitation should they be allowed to move. However, the children are adamant that they do not want to reside with their father. They want to move to North Carolina with their mother, with whom they remain very closely bonded.
Perhaps most problematic is father's total lack of insight into his previously demonstrated parental inadequacies. Nothing has changed in this regard since custody was modified a year ago. This is the same case that was just decided. Were custody to be returned to father, given the resistance of the children to remain in his care and father's unacknowledged and unaddressed parental shortcomings, the court is fairly certain that the situation in father's home would very shortly implode.
The court simply cannot allow that to happen to these children. Although they have had to adjust to being bounced back and forth between their parents [*8]too often and too frequently, mother has already moved to North Carolina. The best case scenario would have been for mother to find a way to remain in New York, but that is not a viable option. Given her income and her available resources, mother cannot afford to provide adequate housing for the children in New York.
A reversion of custody to the father would be emotionally devastating to the children and would produce a volatile home situation marked by constant conflict and a loss of parental control, even worse than it had been in the past. Such a home environment would be detrimental to the physical safety and emotional well-being of these children.
Under the totality of the circumstances herein, the court finds that the proposed relocation would be in the best interests of the children.
Mother must ensure that the children maintain regular visitation with their father by making arrangements to fly the children to New York on a monthly basis. Mother should also ensure that the children have frequent telephone contact with their father. Father can also visit with the children in North Carolina whenever he is able to do so.
A separate order will enter.
Dated: November 10, 2006
_____________________
Barbara Lynaugh
Judge of the Family Court