*607 OPINION OF THE COURT
Richard A. Bollinger, J.
In this matter, a mother seeks court approval to relocate with her two talented sons to Washington, D.C., over the objections of their father. Lacking the wisdom of Solomon to decide this difficult question for two members of the clergy, this court looks for guidance from the Court of Appeals, while hoping, after a trial, to invoke the “wise and discerning heart” referenced in 1 Kings 3:12 (New International Version).
In assessing a parent’s request to relocate, the relevant factors include each parent’s reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child’s future contact with the noncustodial parent, the degree to which the custodial parent’s and child’s life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. (Matter of Tropea v Tropea, 87 NY2d 727, 740-741 [1996]; Matter of Holtz v Weaver, 94 AD3d 1557 [4th Dept 2012].) While weighing all these factors, the primary focus of this court is the best interests of the two sons. (Matter of Holtz at 1557.)
In considering the application of these principles to this case, the court heard testimony from the mother and father and the father’s friend. The attorney for the 14- and 11-year-old sons intoned that they favored remaining in Rochester, a factor for the court to consider, but as precedent clearly indicates, a non-decisive one. (Matter of Nehra v Uhlar, 43 NY2d 242, 249 [1977] [a child’s preference regarding custody is not determinative and the court must examine all relevant circumstances]; Matter of S.M-C. v S.C., 26 Misc 3d 1237[A], 2010 NY Slip Op 50438[U] [Sup Ct, Dutchess County 2010].I[1] In addition, the couple has called Rochester their home for more than a decade, although both were not originally from this community. Both parents have served in the ministry in Rochester — the father as the pastor of a small church and the mother as the dean of Black Church Studies at Colgate Rochester Crozer Divinity School.
*608 Before analyzing these factors, it is undisputed that the mother and father are fine parents. During the trial, there were no substantial complaints about either’s parenting skills. It is also undisputed that the sons are thriving in Monroe County. Both excel in academic performance. Both are heavily involved in activities from LEGO robotics, to Boy Scouts, music, religious instruction and other activities. Neither parent could cite a single example in which the two sons have not achieved substantial success in their home community.
The mother, in seeking to relocate the children, has obtained a substantial career advancement. She landed a position as an associate dean at a university-affiliated divinity school in Washington, D.C. The position pays nearly double what she had made in Rochester. In addition, she has already secured enrollment for the children at top-notch schools in Washington, which, she argues, would afford her children not just comparable, but “better opportunities” academically. While she admits that her children would need to find new friends, she argues — without objection — that her sons are social and affable and would easily find new friends. She also argues that the cultural opportunities for her sons in Washington, D.C., would be enhanced. She testified that the larger African-American community in the District of Columbia would provide better role models and advantages for her sons. In addition, because of her work in a university-affiliated divinity school, the mother indicated that the children would have the advantage of tuition free college educations after she completed her first year at the university.
The father argues that his sons are thriving in Rochester, excelling in school, active in scouts, engaged with friends, and playing music and otherwise appear to be secure in their current environment. He describes his relationship with his children as “close,” and, at one point during his cross-examination of his ex-wife, he held back tears. The father noted that while he has a small apartment, the apartment he now leases is the same size as the apartment in which his ex-wife will reside when she moves to Washington.
This court notes that it is undisputed that the mother is the primary caretaker for the children. She testified, without contradiction, that she performs the daily living tasks: laundry, shopping, doctors’ appointments and discipline. The parents seem to agree that the father’s role is more “interactive” and, in the father’s version, “instructional.” There was no testimony by the father regarding his intention to assume these daily life *609 tasks or his understanding of the need for an ordered structure to assure the sons’ continued high performance. However, there was also no suggestion from the mother that the father was incapable or unwilling to perform these important daily activities for his sons. While the court is left quizzical on this important factor, the lack of any evidence suggesting the father lacks this capability leaves the court unable to draw any unfavorable inference against the father’s position that the sons should remain in Rochester.
Before reviewing the Tropea factors, this court notes that the mother bears the burden of proof: she must establish by the preponderance of the evidence that the Tropea factors — weighed Solomon-like — tilt in favor of the relocation of these children.
1. The Motive to Move
This court does not contest the mother’s motive to move: it is undisputed that she has been presented with a unique challenge to engage in further academic research on early Christianity and in academic administration in a first-class university. Her income will nearly double. She also envisions new significant opportunities for her sons in the bigger metropolitan arena, especially in a city with a substantial African-American community. The court finds her motive beyond question. But, the father’s opposition is equally compelling: he wants to spend time with his sons. He describes roughhousing with his sons, attending events, and engaging them in activities. His motives, in seeking to keep them in this community, are, based on his testimony and demeanor in the courtroom, genuine and substantial. He repeatedly emphasized that the sons’ friends are here and that their social relationships and their academic success — they stand near the tops of their respective academic classes — all define their sense of well-being and confidence.
2. The Quality of the Relationship
In this area, the court is struck by the parallels of the parenting rather than the contrasts. Neither parent complains too loudly about the conduct of the other. The mother offers some sentiments that the sons, when arriving from visitation with their father, are occasionally hungry and tired and their homework may not be completed. These complaints, when viewed against the children’s undisputed academic success, seem minimal. The father offers no complaints against the mother’s parenting skills. The quality of each parent’s relationship is strong: this court cannot find any basis to differentiate between the two parents’ relationships with their sons.
*610 3. Relocation and its Impact on the Quality and Quantity of the Relationship with Their Father
The mother testified that she would use Skype, daily phone calls, monthly extended visitation, holidays and vacations to replicate the current relationship that the sons have with their father. She emphasized that she would finance visits by the father to Washington by plane and the sons’ return to Rochester by the same means or meet the father halfway during the six-hour round trip. But, as a practical matter, the father now has alternate weekends and two evenings a week for visitation. The father testified that these visits involve discussions of the sons’ lives at school, preparing meals and keeping up on their activities. These weekly evening sessions would be replaced by telephone calls. The weekend overnights every other weekend would be replaced by periodic holiday/vacation visits. The children would face constant demands on their expanding personal lives that would be challenged by the need to jump on a plane or drive six hours to visit their father. While the mother suggested that the visitation could be staggered to offer the father even more time with his sons, there is no evidence of any schedule that would produce more contact between the father and his sons after the relocation. The mother suggested she would accommodate the father, but there was no testimony regarding any specific dates or time for such visitation. The mother’s open-ended invitation is appealing, but as this court notes after reviewing hundreds of visitation plans during its service in the matrimonial part and this religious couple can no doubt acknowledge, “the devil’s in the details.” In this court’s judgment, the relocation to Washington, D.C., would impact the quantity of the visitation as well as the casual, easygoing quality described by the father as he interacts with his sons. If the father was required to visit his sons in Washington, there is no evidence of how he would achieve reasonable visitation while staying in a hotel, for example. Based on these factors, the quantity and quality of the father’s visitation would be substantially impacted by the relocation.
4. Economic, Emotional, and Educational Enhancement from the Relocation
The mother’s new employment would result in a substantial increase in her compensation and, when combined with a prospect of reduced or free college tuition, the economic enhancement could be substantial. However, she admits that she will be living in a small apartment (after moving from a three-bedroom *611 home in Rochester) and further the cost of living in Washington is higher, although neither party quantified the difference. Based on this evidence, this court can easily envision that the mother’s increased income would provide access to additional cultural and educational opportunities in Washington. While the mother argues the significance of the difference, this court does not envision a substantial enhancement. The older son, for example, toured Europe with the “People to People” movement this summer and went to Utah with his scouting troop. He has realized substantial educational opportunities right here in Rochester. The mother concedes that the younger son, described as a “standard bearer” for his school, has achieved the same lofty educational status. In short, while the court concedes that Washington offers some unique opportunities of a larger city and the nation’s Capitol and perhaps greater cultural opportunities available in a large African-American community, it appears these children have the skills to seize opportunities in their current environment and, hence, there would be no significant “enhancement” occurring as a result of their relocation.
The mother also described in detail the educational opportunities of university-affiliated schools in the District of Columbia. These institutions, as described by the mother, are undeniably excellent. The mother, as evidence of her engagement in her sons’ educational future, has already confirmed that the sons would be accepted as students in these excellent schools. When asked to compare their future educational opportunities in Washington with their prospects here, the mother described the Rochester experience as “limited when compared with Washington.” But, the mother also acknowledged that the sons’ current school in Rochester shared the same excellence: the mother testified that “she has a high opinion of it.” She admits that her sons are “outstanding students” in the Rochester district. She acknowledged that both the current school in Rochester and the proposed new schools in Washington are “blue ribbon schools.” While this court respects the mother’s judgment as a professional educator and holder of a doctoral degree, nonetheless, the proof does not provide a sufficient basis to differentiate the educational opportunities possible in Washington with those already realized in Rochester. The sons already have an “enhanced” educational experience and the court cannot find sufficient proof to adjudge that the Washington experience would be substantially better for these already fine students.
The “emotional” factor cited by the Court of Appeals is more difficult to quantify. In that regard, the courts have generally *612 suggested that “emotional upset” is a factor in evaluating a relocation petition. (Amy S. v George R.S., 14 Misc 3d 1210[A], 2006 NY Slip Op 52471[U] [Fam Ct, Suffolk County 2006] [the complete breakdown in the relationship between father and child, father’s seeming inability and/or unwillingness to either recognize or rectify this situation, and the tremendous amount of emotional pain were factors to be considered].) In addition, emotional support from extended family can be sufficient to find emotional enhancement in a proposed move. (Vasquez v Vasquez, 4 Misc 3d 1005[A], 2004 NY Slip Op 50719[U] [Sup Ct, Queens County 2004] [emotionally, the children demonstrated no ill effects as a result of the move and the court concluded that the children will ultimately be enriched due to their close proximity to their grandparents, aunt and cousin].) Here, there is no evidence of any emotional difficulties confronting either son. (Kellie A.H. v Peter A.H., 13 Misc 3d 1235[A], 2006 NY Slip Op 52131[U], *7 [Fam Ct, Suffolk County 2006] [emotional considerations when there is evidence that a child is “emotionally fragile and behaviorally volatile”]; see also Rubio v Rubio, 2010 NY Slip Op 33548[U] [Sup Ct, Queens County 2010] [proof that a child has thrived both educationally and emotionally as a factor in deciding relocation].) There is also no evidence that the mother has any extended family in Washington to support the children.
There is no evidence of any emotional insecurity in either child while in Rochester. Neither child needs counseling or other therapeutic intervention. There is no evidence that if their mother relocated and they remained behind, they would suffer any emotional trauma. The mother testified that she discussed the move with her sons and there was no evidence that either of them reacted in any particular manner, either in favor or opposed. Therefore, the court cannot conclude that the mother has established by the preponderance of the evidence that the emotional health of the sons would be favorably impacted by relocating to Washington or harmed by staying in Rochester.
Because both parents are ordained ministers, the court has carefully considered the role of religious and cultural exposure in evaluating the emotional impact of the proposed move on these children. The mother testified that the African-American community in Washington would provide her sons with access to a “religious community that would take them deeper into . . . the African-American religious experience.” She described the importance of “rites of passage” for her sons and added *613 that this African-American tradition would be best accessed in the larger African-American community of Washington. She also testified that larger African-American congregations would provide a broader option for religious experience than the churches of Rochester. She testified that the father, as a part-time pastor, presided over a predominantly Caucasian church. The father cross-examined the mother, inquiring about the sons’ exposure to Rochester area religious congregations, and he later, during direct testimony, acknowledged the importance of his sons’ participation in the experience of African-American churches. While there is undisputed evidence that the mother would continue her sons’ exposure to African-American churches if they moved to Washington, the mother never suggested that the father was insensitive to this need or that he would fail to provide a similarly rooted experience in the vibrant African-American churches here in Rochester.
This court credits the parents’ vital concern about their sons’ religious education and exposure. However, based on the proof before this court, there is no persuasive evidence that the sons’ religious education would be substantially enhanced by a move to Washington. The mother, having served as the dean of the Black Church Studies program at the Colgate Rochester Crozer Divinity School, admitted she was well-aware of the active African-American churches and communities in Rochester and the father affirmed that he would continue their sons’ experience.
5. The Feasibility of Preserving the Relationship between Father and Sons
In considering the final factor, the court must examine the relationship between the noncustodial parent and the child and the feasibility of preserving the relationship. In considering this issue, the court heard testimony that the father has not paid his entire child support for his sons. The court notes that the issue was not seriously pressed by the mother: her counsel never inquired about the status of the child support payments during direct examination. The court unilaterally raised the issue. There is no evidence of the exact amount of any arrears or any explanation — by mother or father — why the sums are not paid in full. The court is also concerned that the mother has paid most of the “extracurricular expenses,” including the sons’ trips to Europe and Utah and music lessons at the famed Hochstein School. There is no evidence the father made any contribution to these expenses. While this court could conclude that *614 the failure to bring the child support current — or pay for extracurricular expenses — is some evidence of the father’s weakened or less-than-a-full-partner relationship with his sons, there is no evidence — or any complaint — from the mother to support this conclusion. In her evaluation of the father’s relationship with her sons, she never mentioned any deficiency in the child support payments or his failure to pay for expenses. Therefore, this court declines to conclude that the unpaid child support is any evidence of a diminished relationship between the father and his sons.
There is evidence before the court that the father failed to take advantage of additional visitation time made available under the judgment of divorce. The judgment of divorce permits the father extended weeks during the summer, but the father has never utilized such extended visitation and offers only a token excuse for his failure to do so. Certainly, a father who shares the father’s powerful relationship with his sons would seemingly jump at the chance to be with them for extended time during the summer. This court notes that other courts have concluded that inconsistent and sporadic visitation can be evidence that relocation would not substantially interfere with a parent’s rights as a practical matter. (Matter of Curtis L.S. v Janice P.W., 12 Misc 3d 1191[A], 2006 NY Slip Op 51532[U] [Fam Ct, Richmond County 2006]; Matter of Ira S. v Lauren S., 23 AD3d 288 [1st Dept 2005].)
However, this court declines to draw an adverse inference from the father’s failure to utilize all of his time with his sons. There is no evidence that the sons have expressed disappointment with their father’s summer visitation and no evidence that his failure on that score interferes with the relationship with them. The attorney for the sons, in her cross-examination, discussed the missed opportunities, but could produce no evidence of any adverse impact on the two sons.
There is also no evidence before this court that “suitable visitation” arrangements could preserve the relationship between father and sons if they moved. The mother made vague reference to plane fares and accommodations and one weekend a month trips back to Rochester. However, there was no evidence that these arrangements, amorphous as they were described, would duplicate the father’s apparent close relationship with his sons. The father also testified that, on occasion, he would supervise his sons when their mother had extra work assignments. She taught, at one point, on a Monday night and the *615 father supervised the children on that night in their mother’s absence. The flexibility of this occasional visitation — whether characterized as “right of first refusal” or “spur of the moment” — would be erased by distance if the sons moved to Washington.
Finally, this court notes that the wishes of the two sons are clear — they desire to stay in Rochester — and their wishes have some role in this court’s decision. The child’s wishes are “some indication of what is in [his or her] best interests.” (Eschbach v Eschbach, 56 NY2d 167, 173 [1982]; Matter of Valenti v Valenti, 57 AD3d 1131 [3d Dept 2008] [a child’s preferences are one of the factors to be considered in making a custody determination]; Matter of Oddy v Oddy, 296 AD2d 616, 617 [3d Dept 2002].) Neither parent suggests that their sons’ expressed choice is tainted by any parental impropriety. In considering the impact of this preference, the court notes that the sons are middle school aged and described by their parents as highly intelligent and well-rounded. They are described as in excellent health. There is no evidence of any impairment of their judgment, young as they may be. Based on the proof before the court, the sons have remained firm in their desire to stay in Rochester since their mother announced the potential move four months ago. The sons know the living options in their father’s apartment and they are familiar with his preacher’s lifestyle and, although their father’s lifestyle is based on a much smaller income than their mother’s future income, the sons’ preference remains firm.[2] The constancy of their preference and the sound basis for it — it is undisputed that they have friends, opportunity, activities and substantial academic success in Rochester — requires that this court ascribe some significant weight to their choice.
The court notes that there were several other minor issues before the court, but the court, seeking to render a decision on the move before commencement of the school year, deferred hearing proof on these questions. Those matters will be heard at another time.
Conclusion
For all these reasons, this court concludes that the mother has failed to prove by the preponderance of the evidence that the relocation to Washington is in the best interests of her two sons based on the Tropea factors. The mother has solid reasons *616 to request the change. She passionately believes — and reasonably anticipates — the opportunities — the future for her sons— merit the change. The father, equally fervid about the here and now, seeks to retain the status quo during the advent of his sons’ teenage years. The Court of Appeals, by assigning the difficult burden of proof to the party seeking the change in Tropea, evinced a preference, when dealing with changes for children, for preserving the here and the now and the status quo. This court will not — nay, cannot — argue with that wisdom.
The father, in his questioning of the mother, referenced the fact that the greatest gifts parents give to their children are roots to grow and wings to fly, paraphrasing a line from W Hod-ding Carter II, the famed Southern writer. In this case, a forward thinking mother wants to give her sons new wings, from a new nest, to fly to higher heights. Their father, acknowledging that although the wings for his sons may not be as substantial in their smaller, “more intimate home community,” as he described it, nonetheless wants to make sure their roots will still be sturdy enough to permit them to fly confidently with any wings to the highest heights.
This court, humbly and prayerfully seeking to invoke the gift given to Solomon — “discernment in administering justice”[3] — concludes that the petition for relocation must be denied.

. As courts have noted, if the child’s choice was all that mattered, then all a court would be required to decide is whether a child’s preference for a parent is voluntary and untainted and then follow the child’s wish. (Matter of Cornell v Cornell, 8 AD3d 718, 719 [3d Dept 2004]; Dintruff v McGreevy, 34 NY2d 887, 888 [1974].)

. In contrast, if a child’s wishes are “confused and changing,” they may be given little weight. (Matter of Rivera v LaSalle, 84 AD3d 1436, 1438 [3d Dept 2011]; Matter of Gravelding v Loper, 42 AD3d 740, 743 [3d Dept 2007].)

. 1 Kings 3:11 (New International Version).