Lynch, J.
(dissenting). Because we do not agree that there is a sound and substantial basis for finding that the child’s best interests are served by awarding primary physical custody to respondent (hereinafter the father), we respectfully dissent.[1] In our view, Family Court’s observation that it was “self-serving and convenient for [petitioner (hereinafter the mother)] to take prolonged advantage of [the maternal grandmother’s] generosity, up until such time as when the mother decided that she was in a position of sound social and financial standing, such that she can now take care of her child,” indicates that the court did not consider the father to have an obligation equal to that of the mother to care for the child during the early years of her life and is a fundamental flaw in the court’s analysis. Importantly, both parents allowed the maternal grandmother to raise their child, and there is not really any dispute in the record that this decision was best for the child at the time.
Turning to the applicable factors, “the principal concern in any child custody dispute is the best interests of the child, to be determined by reviewing such factors as maintaining stability for the child, the child’s wishes, the home environment with each parent, each parent’s past performance, relative fitness, ability to guide and provide for the child’s overall well-being, and the willingness of each parent to foster a relationship with the other parent” (Matter of Baker v Spurgeon, 85 AD3d 1494, 1496 [2011], lv dismissed 17 NY3d 897 [2011] [internal quotation marks, brackets and citation omitted]). As this is an initial *1357 custody determination, the mother’s decision to relocate “is but one factor among many” that may be considered as part of the best interests analysis (Matter of Saperston v Holdaway, 93 AD3d 1271, 1272 [2012], appeal dismissed 19 NY3d 887 [2012], 20 NY3d 1052 [2013]), and the focus must be whether it is in the child’s best interests to live with the mother or the father, not on whether a proposed relocation would be in the child’s best interests (see id.; compare Matter of Tropea v Tropea, 87 NY2d 727, 740-741 [1996]).
Considering the parties’ past performance, and despite the recent estrangement between the mother and maternal grandmother,[2] the record shows that, from the time the mother left for college, she remained in almost daily contact with the grandmother with regard to the child’s development, health and education and had frequent visits with the child over the years while working to put herself through school. The mother testified that it was always her intent and goal to get into a position where she could have the child live with her. In our view, the record shows that the mother made considerable efforts in maintaining a relationship with the child throughout the child’s life. For example, the actual, uncontroverted testimony was that from 2003 to 2004, the mother was home every weekend and every holiday and break during the first semester at college, returned home during the mid-semester break, was home 70% of the weekends during the second semester, and resided at home all summer. During the 2004 to 2005 school year, the mother was attending school full time and working 30 hours a week. She returned home more than half of the weekends, despite not having a car after November 2004. The mother lived at home during the 2005 to 2006 school year through the end of the summer of 2006, although she would occasionally spend overnights with a boyfriend, who lived in the Town of Potsdam, St. Lawrence County. The mother testified that from the fall 2006 semester through her graduation from college in August 2008, she was again working at least 30 hours a week, and that she returned home at least two weekends a month and was home for holidays and school breaks.
After the mother graduated in August 2008, she moved out of state because her boyfriend, who is now her husband, accepted an engineering position in Delaware after losing his job in the City of Plattsburgh, Clinton County. The mother testified that when they moved to Delaware, it was everyone’s belief that the child would move to Delaware beginning in the fall of 2009. The *1358 mother testified that from August 2008, when the child was five years old, to July 2011, when the child was eight years old, the child visited Delaware and the mother traveled to New York to be with the child on holidays and for both the mother’s and the child’s birthdays. The mother testified that it was in “our” best interest to become familiar with the area before moving the child. Indeed, by the end of the summer of 2009, the mother had moved into a different home and had completed all of the paperwork to have the child start school in Delaware beginning in September 2009. This did not occur because the father, with the maternal grandmother’s assistance, petitioned for visitation. The mother filed a cross petition for custody, but the parties ultimately agreed to withdraw their respective petitions and resumed their informal arrangement, with the maternal grandmother having primary physical custody of the child.
The evidence demonstrates that the mother returned to New York in July 2011 while her boyfriend remained in Delaware because she believed that the maternal grandmother was going to petition for custody of the child and she believed that she should be in New York so she could seek custody. After the maternal grandmother petitioned for custody in late July or early August 2011, the mother cross-petitioned for custody in September 2011 and the father cross-petitioned for custody in January 2012. This is the proceeding under review.
For his part, while his military service, including two eight-month deployments in Iraq, is commendable, the father had one contact with the child as an infant, but did not contact the maternal grandmother or mother or otherwise inquire of the child for more than four years, even when home on leave between his overseas deployments.[3] Upon his honorable discharge in 2007, the father enjoyed occasional visits with the child at both his and the maternal grandmother’s convenience. Still, it was not until 2009, when the mother attempted to relocate the child to Delaware, that he sought, with the maternal grandmother’s assistance, a formal visitation schedule. The father testified that after the informal resolution of the 2009 petition and cross petition, he saw the child approximately every other weekend. By temporary order issued in October 2011, the maternal grandmother was granted primary physical custody, with the mother granted three weekends and the father one weekend of parenting time each month. In September 2012, after the maternal grandmother withdrew her petition for custody and *1359 moved to Arizona, Family Court issued an order granting the father primary physical custody of the child with extensive parenting time to the mother.[4] By the November 2012 custody hearing, the revised custodial arrangement was relatively new for the mother, the father and the child.
As for their respective abilities to provide for the child’s well-being, the mother is working nearly full time, and her husband is employed full time as a civil engineer. They each own cars and together purchased a home in a community with a good school, and the child has developed a relationship with her maternal aunt and cousins who live nearby. The maternal aunt and the mother’s husband each testified with regard to their relationships with the child and ability to help care for her. At the time of trial, the father, who had been deemed by the Department of Veterans Affairs in 2011 to have an increased disability of 70% as a result of posttraumatic stress disorder, was not working, but was attending school full time.[5] He was renting a home from his mother and, because his driver’s license had been suspended until 2015 after he was convicted of multiple alcohol-related offenses, he relied on his mother, father and unspecified friends and acquaintances for transportation for himself and the child.
The attorney for the child argues that Family Court’s determination is supported by the requisite sound and substantial basis. In this regard, if a child is able to articulate a custodial preference, his or her “wishes are ‘some indication of what is in [his or her] best interests’ ” (Matter of Rivera v LaSalle, 84 AD3d 1436, 1438 [2011], quoting Eschbach v Eschbach, 56 NY2d 167, 173 [1982]). However, in general, a nine-year-old child’s preference should not be given “great weight” (Matter of Rivera v LaSalle, 84 AD3d at 1439 [internal quotation marks and citations omitted]).[6]
Finally, while Family Court focused on the mother’s estrangement from the maternal grandmother, the evidence clearly demonstrates that the mother and the father both expressed a willingness to foster a relationship with the other parent. To this end, the mother testified during the hearing that she would *1360 be willing to allow the father to exercise parenting time two weekends a month with more time in the summer, holidays and during school vacations. In our view, based on the evidence adduced at the hearing, the child’s best interests would be served if the mother had primary physical custody and the child’s relationship with her father, paternal grandparents, friends and pets can continue to develop and grow through the father’s exercise of liberal parenting time. Accordingly, we would reverse Family Court’s order, grant primary physical custody to the mother and remit to Family Court to develop a liberal parenting schedule for the father.
Garry, J., concurs.
Ordered that the order is affirmed, without costs.

. Despite being advised that he could apply for assignment of counsel, the father did not participate in this appeal.

. We do not find anything in the record indicating that the mother “attempted to tear down” or otherwise criticize the maternal grandmother.

. The father’s record testimony was that the mother told the father once, in December 2003, when the child was five months old, that he “wasn’t going to be a part of [the child’s] life.”

. Pursuant to the September 2012 order, the mother had custody of the child for two weekends and two full weeks during the period beginning August 3, 2012 to September 9, 2012.

. We note that this evaluation was not considered permanent, and is subject to future review by the Department of Veterans Affairs after December 2015.

. Family Court erred to the extent that it discussed the substance of its conversation with the child (see Matter of Lawrence v Kowatch, 119 AD3d 1004, 1006 n 1 [2014]; Matter of Rivera v LaSalle, 84 AD3d at 1437).