OPINION OF THE COURT
Ellen Gesmer, J.
Plaintiff MC (the wife) moves to vacate a stipulation of settlement dated September 11, 2007 (the stipulation) on the grounds *218 that she signed it under duress, and as a result of misstatements made to her by her prior counsel. In the event that her application to vacate is granted, she asks that the action be restored to the calendar so the court can determine her applications for equitable distribution and for leave to relocate to Florida with the parties’ child. Defendant GC (the husband) vigorously opposes the application. After considering the parties’ memoranda and oral argument, the court scheduled a hearing solely on the wife’s application to vacate the stipulation.[1] At the two-day hearing, the wife testified on her own behalf, and the husband presented the testimony of the wife’s former attorney (Ms. Smith).[2] The parties then submitted further memoranda of law.
For the reasons set forth below, the court grants the wife’s motion to vacate the stipulation, and restores the matter to the contested calendar of this court for a preliminary conference to be held on June 11, 2009 at 9:30 a.m. in Part 18.
Credibility
In evaluating the relative credibility of the witnesses, I must consider their educational levels and their backgrounds. The wife has a limited education, consisting of a GED and a few months of college. She had no familiarity with the legal system, both in general and with respect to divorce. Her testimony appeared to be entirely candid, and her memory lapses and inconsistencies were typical of a layperson being asked to recall details of meetings which she had no duty to record. Ms. Smith also had gaps in her memory and inconsistencies in her testimony. However, in contrast to the wife, Ms. Smith is an associate attorney at a large law firm, Skadden, Arps, Slate, Meagher & Flom, LLI^ where attorneys are ordinarily expected to keep records of their time and notes of their conversations with clients. Despite this fact, she brought *219 to court no time records, no records of her conversations with the wife, and no copies of any relevant documents. In the absence of time records, I find her testimony as to the length of their meetings to be self-serving, and I do not credit it. I also disregard, under the best evidence rule, her testimony as to the contents of documents that she testified about but did not produce.[3]
Two other factors caused me to find that Ms. Smith’s testimony was not reliable. First, Ms. Smith’s testimony was often confused. For example, she testified first that the divorce complaint had been filed, then that it was not, then that it was, then that it was not, and then that it was. She also could not give a clear explanation as to why the notary indicated that the wife had signed the stipulation on September 11, 2007, when Ms. Smith testified that she signed it on October 15, 2007. Finally, Ms. Smith was often evasive and indirect in her answers. When asked a simple question such as, “Did [the wife] request that the relocation be a part of the divorce proceedings,” she answered, “At a certain point it became disputed,” and only answered directly the third time she was asked the question, when she finally answered, “yes.”
The husband argues that the wife’s testimony is not credible because she answered “yes” to the question of whether her affidavit in support of her motion “include[d] the entire basis of your application here,” even though she testified as to grounds not laid out in her affidavit. I decline to find a lay witness incredible because of decisions made by her attorney as to what statements to include in her affidavit.
For all of these reasons, to the extent that the testimony of the wife and Ms. Smith differed, I credited the wife’s testimony.
Facts
MC married GC on August 9, 2002. In March 2003, their son BC was born.
In the winter or spring of 2007, the wife decided to pursue a divorce, and retained inMotion, a not-for-profit organization *220 which represents women without charge.[4] She then received a call from Ms. Smith, who said that she was going to represent the wife without charge on behalf of inMotion. Ms. Smith had never previously handled a divorce case.
On or about March 8, 2007, the wife met with Ms. Smith at her office. Ms. Smith gave the wife some papers to fill out, to describe what had happened in her marriage and why she was seeking a divorce. Ms. Smith left the wife in the office, and came back occasionally to check in on her. When the wife finished writing, she gave the papers to Ms. Smith, who said that she would type up the information, and would then call the wife to come back and sign papers. During that meeting, the wife told Ms. Smith that she wanted to relocate to Florida to give her children a better life. Ms. Smith stated that inMotion would not permit her to represent the wife on that issue. The wife told Ms. Smith that she believed that the husband “wasn’t going to give me the divorce [and] was going to fight the whole divorce case.” Ms. Smith responded that maybe he would sign a settlement agreement, and the divorce would proceed easily. I credit the wife’s testimony that they actually talked for only about 15 minutes that day.
Ms. Smith testified that she told the wife that day that she was entitled to get information concerning the husband’s assets. However, I do not credit this testimony because, when asked what the wife’s response was, Ms. Smith testified, “I — it wasn’t — I mean she — it wasn’t an issue at that point. I mean, it wasn’t.” I also do not credit her testimony that she told the wife that day that she would be entitled to half of any assets acquired during the marriage.
Ms. Smith contacted the wife by telephone and e-mail in the . following weeks. Ms. Smith testified that she asked the wife for various information, but that the wife did not provide it to her, saying that she just wanted to move on with her life.
The wife and Ms. Smith met again on or about May 24, 2007 for 10 or 15 minutes. Ms. Smith advised her that the husband had hired an attorney and that it appeared that he would not agree to a settlement easily. Ms. Smith gave the wife the complaint to sign and the wife signed it. The wife also signed that day a document titled: “INMOTION UNCONTESTED *221 DIVORCE PROGRAM EQUITABLE DISTRIBUTION WAIVER” (the waiver). That document stated that she gave up her right to seek a share of marital assets. The last sentence stated that if she decided “to seek a share of the marital assets or a division of the marital debt from my husband, inMotion and the law firm representing me may drop my case.” In response to the question as to whether she believed that she could unilaterally “drop” the wife as a client if the wife wanted to pursue equitable distribution after the divorce case had been filed, Ms. Smith testified alternatively that she believed she could “drop” her and that she could not. Ms. Smith also said that she did not focus on the last sentence of the waiver. I credit that statement as being the most accurate description of what occurred; that is, she did not think through the implications of the waiver at the time that she requested that the wife sign it.
Although the complaint and the waiver stated that the wife would not make a claim for equitable distribution, the wife testified that she did not know the meaning of those words at the time that she signed it. That is entirely consistent with Ms. Smith’s testimony that she explained the waiver of equitable distribution by stating: “I told her that by waiving that at this point, you know, if she wasn’t interested, if she waived her rights that she wouldn’t later be able to seek, go after them.” From that statement, it is certainly not surprising that the wife did not know the meaning of equitable distribution. In any event, it is difficult to credit Ms. Smith’s testimony that she explained anything about equitable distribution, because she also testified that it was her “understanding from the outset [that] there was [sic] no equitable assets to be distributed.” Moreover, she testified that she was not certain that she could have explained the wife’s rights under equitable distribution that day, since she did not know what her assets were. Therefore, I credit the wife’s testimony that Ms. Smith never discussed with her her rights under equitable distribution, including her rights, if any, to the husband’s retirement plan, or her right to seek contribution from the husband for her debts and her arrears to her landlord.
On May 30, 2007, the complaint was filed, listing Ms. Smith as the attorney of record.
In late June, the husband’s attorneys sent Ms. Smith a notice of appearance, and a letter containing a settlement proposal, which she discussed with the wife. Based on those conversations, Ms. Smith discussed settlement with the husband’s counsel.
*222 The wife and Ms. Smith had a third meeting on or about July 2, 2007. At that time, Ms. Smith advised the wife that the husband’s attorney had filed papers requesting full custody of BC. The wife again told Ms. Smith that she wanted to relocate to Florida with BC. Ms. Smith said that she could not “touch the relocation matter” because inMotion would not allow her to. That made the wife fearful that she would not have an attorney, and she told Ms. Smith that she felt that she needed an attorney. Ms. Smith claimed that she told the wife that she would not be successful if she sought to litigate relocation because of governing case law, and, more specifically, because her son was young and close to his father, and because she did not have a job in Florida.[5] Ms. Smith again told her that she would only represent her in an uncontested divorce. Ms. Smith also told her that, if the settlement negotiations broke down over visitation, she would withdraw from representing her. The wife then began to cry, and Ms. Smith told her that it was “nice” that her son was close to his father.
Ms. Smith did not tell the wife that, if the matter became contested, she could ask for guidance from inMotion and attempt to take on the divorce as a contested matter, nor did she tell her that she could look into referring her to an attorney at inMotion who handles contested divorces.
In early July, Ms. Smith contacted the wife, who wanted to know if the negotiations had moved forward. Ms. Smith told her that the negotiations had not advanced. She also told the wife that it was her understanding that, if they went before a judge, her husband would probably get more visitation.
On July 30, 2007, Ms. Smith sent the wife a letter, in which she advised the wife that the husband had filed a notice of appearance, “thereby changing the status of your divorce case from an uncontested matter to a contested one.” She conceded on cross-examination that this was not a true statement. She also stated in the letter that the next step would be for the husband’s lawyer to file a “Reply,” to which she would file an “Answer.” This was also an incorrect statement. Ms. Smith went on to say that she considered the husband’s proposed settlement terms “reasonable,” and advised the wife that “if this issue goes to court, a judge will likely increase the husband’s overall visitation rights.” She stated this even though the exist *223 ing visitation terms had been set by a Family Court judge. Moreover, she gave this opinion without knowing whether the Family Court order had been issued after a trial or based on a settlement. Ms. Smith went on to state:
“So that there are no misunderstandings with respect to my role in this matter, I am reiterating the scope of my representation. Please be advised that I was not retained for a contested divorce, nor was I retained to advise you regarding relocation. Rather, you originally retained me as pro bono counsel for an uncontested divorce, based on the facts that you presented to [ijn Motion. As such, if settlement negotiations break down over an unreasonable disagreement as to visitation rights, I will withdraw my representation. Furthermore, I will not negotiate the relocation issue under any circumstances.
While I am sorry to hear about your current living situation, and am well aware of your desire to move to Florida in the near future, I do not have the experience or the time to handle a lengthy relocation trial. However, once you obtain this divorce, if you do obtain it, you are free to hire whomever you wish, maybe even court appointed counsel, to litigate the relocation issue.”
Ms. Smith did not suggest in the letter that the wife could retain new counsel to raise the issue of relocation prior to entry of a judgment of divorce.
In early August, the wife told Ms. Smith that she was willing to settle. Ms. Smith made clear to the wife that the husband would not agree that she could relocate, and that the stipulation would provide that she could not relocate. In response to the wife’s questions, Ms. Smith reassured her that she could file for relocation after the divorce was final. That statement induced the wife to agree to sign the stipulation, because she believed that she could commence a relocation action after the divorce judgment was signed. She did not understand that, by signing the stipulation, she was waiving her right to have a trial, and that she could have raised the relocation issue at a trial. Ms. Smith also did not tell her that the relocation provision in the stipulation would make it more difficult to obtain court permission to relocate.
According to the wife, she and Ms. Smith never discussed equitable distribution of marital property and debts, or spousal maintenance. Although the wife told Ms. Smith that she was *224 behind in her rent because the husband did not give her any money, Ms. Smith did not advise her that she had any right to ask that he help to pay her debts. The wife never saw a net worth statement or any financial papers concerning the husband, and was not aware that she was entitled to see those; in fact, as Ms. Smith acknowledged, there was no financial disclosure whatsoever. Indeed, Ms. Smith testified that she did not think that a net worth statement would have helped her to determine whether there were any assets to distribute.
The husband signed the stipulation on September 11, 2007, and his counsel sent it to Ms. Smith.
On October 15, 2007, the wife met with Ms. Smith. Ms. Smith handed her the stipulation and left her to read it, occasionally coming back in to check on her. They spent no more than 5 to 20 minutes together. Ms. Smith told the wife that the stipulation reflected what they had discussed. With regard to BC, the stipulation provided that the wife had sole custody, subject to the husband’s visitation, consisting of alternate weekends, from 7:00 p.m. on Friday to 7:00 p.m. on Sunday; alternate holidays; and one month during the summer. The stipulation further provided that “neither party may relocate without notice and consent of the other party or court order.” The stipulation further provided that the parties had already divided their property and waived all further claims for equitable distribution. Finally, the stipulation provided that each party had received full financial disclosure from the other.
Ms. Smith told the wife that the husband was seeking custody, but that he would give up that claim if she signed the stipulation and agreed to his having BC for one month in the summer. Ms. Smith again explained that she would not “touch” the relocation issue, but that the stipulation would not bar the wife from relocating because she could raise it in court later. At the time that the wife signed it, she did not read paragraph 7.1 concerning full disclosure, or paragraph 11.5 as to the binding nature of the stipulation. Ms. Smith also did not explain to the wife the meaning of article 5 concerning spousal maintenance, or article 8 concerning debts. The stipulation did not provide for health insurance for EC’s benefit. The wife did not read the entire stipulation line by line, but rather skimmed it, based on Ms. Smith’s representation that it included the terms that they had previously discussed. In addition, she believed that, as her attorney, Ms. Smith “should be doing right for me.” Ms. Smith did not ask the wife at the time if she was signing the stipula *225 tion willingly and freely, and without any duress or coercion. The stipulation is dated September 11, 2007 and the person who notarized the wife’s signature swore that the wife appeared before her on September 11, although Ms. Smith testified that it was signed on October 15.
After the wife signed the stipulation, Ms. Smith advised her again that she could still pursue relocation later. Ms. Smith did not inform the wife that the agreement was binding, that it disposed of all issues raised in the divorce, and that she had waived her right to a trial. MC also testified, and Ms. Smith admits, that Ms. Smith did not advise her that signing the stipulation would make it less likely that a judge would permit her to relocate at a later time. Indeed, Ms. Smith admitted that she had never told the wife it would be more difficult to seek relocation after the divorce became final.
Analysis
Despite the judicial preference for enforcing agreements made between spouses, they are subject to greater scrutiny than contracts in other contexts, and the Court of Appeals has made clear that equity must intervene to vacate them when they are not “arrived at fairly and equitably . . . [and] free from the taint of fraud and duress” (Christian v Christian, 42 NY2d 63, 72 [1977]). Courts have intervened where a spouse is unrepresented (Christian, supra, 42 NY2d 63 [1977]; Parker v Parker, 66 AD2d 328 [1st Dept 1979]; Pisano v Pisano, 71 AD2d 670 [2d Dept 1979]; Pennise v Pennise, 120 Misc 2d 782 [Sup Ct, Nassau County 1983]), where an attorney has not appropriately represented a party’s interests (Herrington v Herrington, 56 NY2d 580 [1982]; Bartlett v Bartlett, 84 AD2d 800 [2d Dept 1981]), where there has been a lack of financial disclosure (Weinstock v Weinstock, 167 AD2d 394 [2d Dept 1990], lv dismissed 77 NY2d 874 [1991]), and where it is apparent that the agreement is otherwise tainted by “inequitable conduct” (Greer v Greer, 131 AD2d 321, 325 [1st Dept 1987], quoting Christian, 42 NY2d at 73; see also Matter of Ruiz v Rivera, 300 AD2d 402 [2d Dept 2002]). Because of the equitable considerations which govern the enforceability of matrimonial agreements, a party seeking to vacate an agreement between spouses need not show grounds sufficient to rescind a contract under other circumstances (Christian, 42 NY2d at 73; Greer, 131 AD2d at 323-324).
In this case, the wife has shown that the execution of the stipulation was inequitable in that she unwittingly gave up her *226 right to a trial of the issue most important to her: her desire to move to Florida with the parties’ child. Furthermore, she gave up her right to equitable distribution without understanding what that term means, and without any financial disclosure. She has testified convincingly that she would not have signed the agreement but for misstatements of fact and law to her by Ms. Smith. Consequently, the wife did not have meaningful legal representation on the issues of custody and equitable distribution. The wife has also shown that she acted under duress in that she believed, based on inaccurate statements to her by Ms. Smith, that she would not be able to obtain a divorce with the assistance of counsel unless she signed the stipulation.
I.
The Wife Entered into the Stipulation as a Result of Misstatements of Fact and of Law Made by Ms. Smith
The wife executed the stipulation in reliance on three significant statements made by Ms. Smith: (1) that Ms. Smith’s firm could “withdraw” from representing her if she sought relocation; (2) that the husband would seek custody if she did not sign the stipulation; and (3) that she would be able to seek relocation after signing the stipulation. The first and third statements were contained in Ms. Smith’s July 30, 2007 letter to the wife. The wife testified to the second statement and Ms. Smith did not deny making it.
Each of these statements is incorrect. Once Ms. Smith had filed the divorce action on the wife’s behalf, she was not free to simply withdraw from representing her, or, as stated even more harshly in the waiver, to “drop” her case. Rather, under CPLR 321 (b), unless the wife retained new counsel, Ms. Smith could not withdraw from representing her unless she made a motion and was given leave by the court to withdraw (see also Vitale v City Constr. Mgt. Co., 172 AD2d 326 [1st Dept 1991]). This requirement is construed strictly, even when it is the client who wishes to discharge counsel (Moustakas v Bouloukos, 112 AD2d 981 [2d Dept 1985]; Benefield v City of New York, 14 Misc 3d 603 [Sup Ct, Bronx County 2006]; Matter of Seventh Jud. Dist. Asbestos Litig., 1 Misc 3d 279 [Sup Ct, Monroe County 2003]). Moreover, where counsel seeks permission to be relieved, the court need not grant it, in the absence of good cause (Matter of Jamieko A., 193 AD2d 409 [1st Dept 1993]), such as where a client insists that the attorney pursue legally unsupportable claims *227 (Matter of Harlem-Dowling Children’s Servs. v Laverne F., 169 AD2d 410 [1st Dept 1991]), a client fails to communicate with counsel or there has been some other total breakdown in the relationship between attorney and client (Bok v Werner, 9 AD3d 318 [1st Dept 2004]), or a paying client has failed to pay her attorney (Benefield v City of New York, 14 Misc 3d 603 [2006]). It is certainly an open question as to whether a court would have permitted Ms. Smith to withdraw as counsel on the grounds that her client was insisting that her attorney represent her on a substantial claim. Indeed, in Harlem-Dowling Children’s Servs. v Laverne F. (supra), the Appellate Division denied the application of appointed counsel to withdraw where it found that her client raised appealable issues. Consequently, it is quite possible that a motion to withdraw by Ms. Smith would have been denied. Therefore, Ms. Smith’s statement to the wife that she could withdraw as her attorney if the wife chose to pursue the issue of relocation was not accurate.
Secondly, Ms. Smith did not testify that the husband had made any custody demands. Consequently, it appears that her statement to the wife that the husband would have pursued custody if the wife pursued relocation was, at most, speculative.
Third, Ms. Smith’s statement that the wife could pursue relocation after signing the stipulation was misleading, at best. The stipulation provided for the entry of a judgment based on its terms, including its provision for visits by the husband on alternate weekends, and a prohibition of relocation. A party who raises the issue of relocation during a divorce proceeding need only show that relocation is in the child’s best interest (Matter of Tropea v Tropea, 87 NY2d 727 [1996]). However, once there is a valid custody stipulation between parents, a court will not even hold a hearing on an application to relocate unless the petitioning party can show that there has been a substantial change in circumstances since the date of the execution of the stipulation (Zindulka v Zindulka, 284 AD2d 631 [3d Dept 2001], lv dismissed 96 NY2d 938 [2001]). Moreover, where, as in the parties’ stipulation, there is a specific “geographical relocation restriction agreed to by the parties and included in their . . . agreement,” that is a factor that the court would have to consider in making its determination as to whether relocation was in the child’s best interest (Tropea, 87 NY2d at 741 n 2). Indeed, some cases have held that, where the parties have negotiated a provision barring relocation, “the best interests of the children required enforcement of the custody
*228 arrangement negotiated by the parties” (Kasal v Kasal, 297 AD2d 624, 626 [2d Dept 2002], lv dismissed 99 NY2d 552 [2002]). Hence, while it is true that the wife could have made an application for relocation after signing the stipulation, it was certainly misleading for Ms. Smith not to tell her that signing the stipulation would make the application far more difficult.
In the context of this case, it is unnecessary to determine whether Ms. Smith knew that any of these three misrepresentations was false at the time she made them.[6] All were careless and inaccurate, and it is clear from the testimony at the hearing that, while the wife had an attorney of record, she had no meaningful representation on financial issues and custody, and, in particular, on her desire to relocate with the parties’ child. I find particularly disturbing Ms. Smith’s failure to find out whether she could have represented the wife in a contested divorce, with support from inMotion or her firm, or whether the wife had other alternatives for representation in a contested divorce. Indeed, if the wife had filed her divorce action without representation and had sought permission to relocate, then the court would have had to consider whether to appoint counsel for her to be paid for by the county to represent her on the custody issue (County Law § 722-c).
In light of these material misstatements, the court must vacate the stipulation (cf Matter of Ruiz v Rivera, 300 AD2d 402 [2d Dept 2002] [stipulation vacated based on inaccurate statements made by the children’s attorney to the grandparents]).
II.
The Wife Entered into the Stipulation as a Result of Duress
A stipulation of settlement in a divorce case may be vacated on the grounds of duress by the party’s attorney (Feuerstein v Feuerstein, 72 AD2d 546 [2d Dept 1979]; Matter of Celauro v Celauro, 58 AD3d 838 [2d Dept 2009]). In Celauro, when the party hesitated to accept her attorney’s recommendation that she discontinue the proceeding, the attorney “screamed and cursed and told [the party and her son] that he would sign a stipulation of discontinuance on the petitioner’s behalf whether they agreed to or not, and that they could ‘sue him for malprac *229 tice’ if they did not like it” (58 AD3d at 839). In this case, Ms. Smith did not scream or curse, but the threat to the wife was the same as the threat to the Celauro petitioner: that she would be left without an attorney if she did not do as she was told. Therefore, I find that Ms. Smith exerted duress in persuading the wife to sign the waiver, and in persuading her not to pursue her claim for relocation.
Because of the duress suffered by the wife, and the misrepresentations on which she relied when entering into the stipulation, the court vacates the stipulation. Accordingly, the court directs the parties to appear for a preliminary conference in this divorce action on June 11, 2009 at 9:30 a.m. in Part 18.
Notwithstanding this decision, the court applauds inMotion for its provision of legal services to low-income women, and appreciates that Ms. Smith and her firm were participating pro bono in that effort. However, legal representation should not be provided in a way which does not give individuals a full understanding of their rights and deprives them of their opportunity to be heard on the issues most important to them. In undertaking pro bono representation, Ms. Smith’s firm should ensure that counsel taking on pro bono matters receive appropriate support and supervision, so that they can provide pro bono clients with the same careful legal representation that they provide to paying clients.
Accordingly, it is ordered that the wife’s motion is granted to the extent of vacating the stipulation of settlement.

. At that time, the husband’s attorney waived his procedural objection to the wife having moved to vacate the stipulation by motion rather than by a plenary action.

. The court is not using the actual name of the wife’s former counsel so as not to embarrass her. Ms. Smith is a young associate at a large law firm who had never handled a matrimonial case before.
She agreed to represent the wife pro bono for inMotion, a nonprofit organization that provides free legal representation to low-income women. The court attributes any errors in her representation of the wife not to her own lack of skill or judgment but to inadequate training, supervision and oversight by her firm and by inMotion, both in handling this matter and in testifying about that representation.

. These include the “case opening report,” the “client questionnaire,” the letter from opposing counsel allegedly containing a settlement proposal, the outline she claims to have created and shown to the wife setting out the law governing relocation, the engagement letter in which the wife allegedly agreed that she would only be represented in an uncontested divorce, the husband’s answer, and Ms. Smith’s notes of her alleged conversations with her supervisors at inMotion.

. I do not credit Ms. Smith’s testimony that the wife signed a retainer letter stating that inMotion would represent her only in an uncontested divorce, since the alleged letter was not produced, and Ms. Smith did not explain its absence.

. I do not credit Ms. Smith’s testimony that she prepared a detailed outline concerning the governing law and reviewed it with the wife, since Ms. Smith failed to produce that document or to explain its absence.

. As discussed in footnote 2 above, the court does not believe that Ms. Smith had the appropriate training and supervision to know whether the statements were false or not.