■ In the Matter of David B., Respondent, v Katherine G., Appellant. [30 NYS3d 5]—

Order, Family Court, New York County (Fiordaliza A. Rodriguez, Ref.), entered on or about January 23, 2015, which, after a hearing, among other things, granted petitioner father's petition to modify a prior consent order to the extent of designating the father's home in Manhattan as the children's primary residence with respondent mother having visitation time, and denied the mother's cross petition to modify the consent order to award her sole custody and permit her to relocate with the children to Katonah, New York, unanimously reversed, on the law, without costs, the petition denied, the cross petition granted, and the matter remitted to Family Court for determination of an appropriate visitation schedule for the father.

Petitioner and respondent are the parents of two sons,

Winter B. (born in 2002), and Orion B. (born in 2005). From 2002 to 2009 they lived in a duplex apartment on 32nd Street in a building then owned by the paternal grandfather. In June 2009 they moved to an apartment on East 68th Street, another building owned by the paternal grandfather.

In 2010, the parties separated, and the mother moved back into the 32nd Street apartment. On September 14, 2010, the parties entered into a so-ordered stipulation providing them with "joint legal custody of the children with the [m]other's home designated as the[ ] [c]hildren's primary residence." The parents agreed to "discuss diligently and agree upon all matters" affecting the children, "including, but not limited to, choice of schools."

One month later, in October 2010, the paternal grandfather commenced eviction proceedings against the mother. In February 2011, he sold the building, and in May 2011, the new owner evicted the mother.

In 2012, the mother petitioned the court to allow her to relocate to Colorado with the children. She alleged that there had been a change in circumstances, i.e., the eviction, and that she was unable to afford similar accommodations in New York City. She wished to move to Colorado where she had family, a house, and an offer of employment.

While the petition was pending, the mother allegedly enrolled the children in school in Colorado for the 2012-2013 year. However, she returned to New York promptly upon denial of her petition.

In September 2013, after staying at various friends' homes, the mother settled in Katonah, in Westchester County. She asserted that it would be in the children's best interests to attend school in Westchester, as she was the primary residential parent. On or about November 15, 2013, the father filed a petition to modify the consent order by granting him sole custody. The father alleged that there had been a change of circumstances in that the mother had relocated to Katonah from Manhattan and refused to comply with the terms of the consent order. The mother filed a cross petition, also seeking sole custody. She alleged a change of circumstances, i.e., that she had been evicted and forced to relocate, requiring the children to travel to Manhattan for school.

At the hearing, the mother testified that she had selected Katonah for its superior school system and to permit the father to have relatively easy access to the children. She described the excellent quality of the Katonah public school system and its numerous extracurricular and athletic programs. When the

children were with her they rode bikes, built forts, and played lacrosse, field hockey and basketball. They also enjoyed going to the town pool and library. The children's school in Manhattan, the Ella Baker School, lacked similar athletic or after-school programs.

The court-appointed psychiatrist opined that the mother had a stronger emotional connection with the children, both of whom had never wavered in their desire to live with her on a full-time basis. He described her as the more "emotionally attuned and available parent." The father lacked a similar strong emotional connection with the children or an awareness of their educational and emotional struggles. It troubled him that the father seemed to be unaware that Winter was at risk of not being promoted to the seventh grade, even after receipt of a promotion in doubt letter from the school.

The psychiatrist noted a "lack of any significant employment history," apart from working for his father, suggesting "a measure of professional underachievement." He also observed the father to have difficulties managing stress. He found his living situation to be "fluid," given the presence of his live-in-fiancee and newborn. The psychiatrist opined that the father "appeared to be somewhat knowledgeable about his children and their functioning, but not necessarily insightful about their emotional needs."

While faulting the mother for being "somewhat self-centered," the psychiatrist acknowledged that the mother was the primary attachment figure for the children. She appeared "to respect her children's uniqueness, seems dedicated to their care and knows them well." Further, she appeared to "perceive her children realistically, with respect to strengths and weaknesses, and strives to better their academic and social lives," and also "to be emotionally attuned to their needs most of the time."

Both children expressed a desire to live with their mother in Katonah, and both reported the prolonged court proceedings to be stressful. The children felt that the mother was better able to understand them and took things "in stride," whereas the father yelled at them or got mad. The attorney for the children supported the mother's petition for relocation based on her investigation, and interviews with the children, and the forensic evaluations.

The Referee found that the father had met his burden of showing a change of circumstances. The Referee criticized the mother for relocating several times, finding that she had violated provision 4.1 of the stipulation, which required her "to provide a stable environment for the continuing parenting of

the children." Focusing primarily on her relocation to Colorado, the court accused her of making "executive decisions" without the father's consent. The Referee disregarded the children's wishes to remain with their mother, citing the "strong possibility that the mother was exerting pressure on the children to declare their allegiance to her." While acknowledging that the mother had a stronger emotional connection to the children, the court nonetheless determined that the children's best interests would be better served if they were in the physical custody of the father during the week.

We now reverse. The father failed to show a change of circumstances warranting awarding him primary physical custody. The father failed to demonstrate that he had the same degree of attention to the children's emotional, academic and social needs as the mother. The father seemed unaware of the severity of the older son's academic problems, even after receipt of a promotion in doubt letter from the school. Only in his interview with the forensic evaluator did he appear to acknowledge that the child's progression to the next grade was in question.

The evidence showed that the father, an Ivy League graduate, has never had a meaningful career independent of his father's real estate business. The father's personal life is also in flux, having recently married the mother of his child. Should the children remain in Manhattan, they will have to share a two-bedroom apartment with the father, his wife, and the new baby.*

The evidence at the hearing demonstrated that the mother was the more competent parent and that she, not the father, was the "primary attachment" figure. The forensic evaluator emphasized that the children had a stronger emotional attachment to the mother and that she was more attuned to their needs. Throughout the proceedings, the children, now entering high school and middle school, have unequivocally stated that they want to live with their mother in Katonah and attend school there.

When the parents separated, the father relied on his wealthy family, while the mother—evicted by the paternal grandfather—took constructive steps to become financially independent and to provide for the children. The father had the luxury of maintaining the status quo; the mother had to scramble to find affordable housing. After a fruitless search for affordable hous-

---

* The court is apprised post-hearing that the father has separated from the wife and that she has returned to France with the baby, indicating further instability.

ing in New York City, she settled in Katonah. The mother throughout maintained her focus on the children; the father began a new relationship and had a new child, introducing more instability into his children's lives. That relationship has now unraveled, leaving the children with another broken home and a half-sister living in France.

The Referee inappropriately focused on the mother's "transience" while overlooking the father's real shortcomings, the wishes of the children, and the fact that the mother's circumstances were precipitated by eviction from the former family home.

The Referee erred in not granting the mother's cross petition to relocate to Katonah. In determining a child's best interests, a court should give weight to all relevant factors, including each parent's reasons for seeking or opposing the move, the quality of the relationship between the child and the parents, the impact of the move on future contact with the noncustodial parent, and the degree to which the custodial parent's life may be enhanced economically, emotionally and educationally by the move (*see Matter of Tropea v Tropea*, 87 NY2d 727 [1996]). These factors weight in favor of relocation. We note that the attorney for the children supported relocation based on her investigation and interviews with the children, and the forensic evaluation (*see Matter of Aruty v Mormando*, 70 AD3d 683 [2d Dept 2010]). The evidence showed the mother to be more attuned to the children's emotional and academic needs. The mother had sound reasons for relocating to Katonah and did so only after failing to find affordable housing in New York City. Katonah is 45 miles from the City and accessible via Metro-North. The mother has exhibited a willingness to maintain a visitation schedule that preserves a positive and nurturing relationship between the children and their father. There is every reason to believe she will comply with liberal visits for the father, including increased summer and vacation time. Winter has just finished middle school and Orion has just completed elementary school, enabling them to transition smoothly into the Katonah schools. We accordingly remand for determination of an appropriate visitation schedule. Concur—Mazzarelli, J.P., Renwick, Manzanet-Daniels and Kapnick, JJ.

