Matter of Jasmine M. v Albert M. (2025 NY Slip Op 04695)

Matter of Jasmine M. v Albert M.

2025 NY Slip Op 04695

Decided on August 14, 2025

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 14, 2025

Before: Kern, J.P., Moulton, Kapnick, Gesmer, Pitt-Burke, JJ. 

Docket No. V-34468-17/22A|Appeal No. 3691-3692|Case No. 2023-06118 2023-06119|

[*1]In the Matter of Jasmine M., Petitioner-Respondent,
v
Albert M., Respondent-Appellant. 

Tilem & Associates, PC, White Plains (Cindy N. Brown of counsel), for appellant.
Eskin & Eskin, Bronx (Monica Eskin of counsel), for respondent.
Janet Neustaetter, The Children's Law Center, Brooklyn (Laura Solecki of counsel), attorney for the child.

Amended order, Family Court, Bronx County (Rosanna Mazzotta, Referee), entered on or about November 27, 2023, which, after a fact-finding hearing, and to the extent appealed from as limited by the briefs, granted the mother primary physical custody of the subject child and permission to relocate to Florida with the child, affirmed, without costs. Appeal from order, same court and Referee, entered on or about October 30, 2023, dismissed, without costs, as academic.
Family Court's determination is supported by a sound and substantial basis in the record, as the mother sustained her burden of establishing that the child's best interests would be served by allowing her to relocate with the child to Florida (see Matter of Tropea v Tropea, 87 NY2d 727, 740-741 [1996]). Family Court's order is based in large part on its finding that the father's testimony "was self-serving, inconsistent and less than credible. [He] frequently made conclusory assertions in support of his position. [The] [m]other's testimony was forthcoming and consistent, and as such, the Court credits [the] [m]other's testimony in full as credible." "Family Court's credibility determinations are entitled to great weight, as it has the opportunity to observe the parties' demeanor and body language" (Matter of Michael Y. v Dawn S., 212 AD3d 493, 495 [1st Dept 2023]).
Background
The parties have one child together, who was nine years old at the time of trial. They separated when the child was an infant. After the separation, the child lived primarily with the mother in the Bronx, and had parenting time with the father, who lives in Brooklyn.
The child has generally performed well academically. He has an Individualized Education Program (IEP) due to behavioral problems. When he was in pre-kindergarten, the mother and the child's teachers agreed that the child should be evaluated. The father was initially reluctant, but eventually consented. As a result, the child's behavioral issues have been addressed by services at school, including a paraprofessional, a specialized class setting with two teachers, and group and individual counseling.
By order on consent dated January 16, 2019, the parties agreed that the mother would continue as the primary physical custodian, with final decision-making authority after consultation with the father. They further agreed that the father would have parenting time on the first, second, and fourth weekends of each month, from Friday at 6:00 pm to Sunday at 6:30 pm; Thanksgiving day and Christmas Eve to Christmas Day in odd years; and New Year's Eve to New Year's Day in even years.
On May 26, 2022, the mother filed a petition seeking a modification of the custody order to permit her to relocate with the child to Florida, where her then fiancÉ (now husband) and his two children live and where she had found work as an occupational therapist after having difficulty finding employment in New York during and after the pandemic.[FN1] She asserted that the move would be in the child's best interest because the child would have better housing in a safer neighborhood and a better overall quality of life, and that she would ensure that the father had the same or more parenting time than he had under the 2019 order, as well as daily phone or video contact with the child.
On August 25, 2022, the father filed a modification petition seeking primary physical custody of the child. He asserted that the move to Florida would "undermine and diminish" his role in the child's life, and claimed that the child was "more responsive" to the father than to the mother in their efforts to address the child's behavioral issues.[FN2]
On August 31, 2022, while the petitions were pending, the mother agreed to leave the child in the father's temporary care in New York and went to Florida. While in Florida, she spoke with the child daily and visited the child approximately twice each month in New York. The child also stayed with the mother in Florida during three school breaks. The mother also testified that, when she moved, she had believed that the court proceeding would be concluded in or about December 2022.
The custody modification trial commenced on May 8, 2023. The parties and the attorney for the child stipulated on the record that day that changed circumstances existed requiring a modification of the parties' existing custody order in the child's best interests. The trial continued through September 8, 2023.
On November 27, 2023, the court issued the order appealed from, granting the mother's petition. The father's motion to this Court for a stay of the order was denied on December 28, 2023. The father appeals from Family Court's order. Discussion
In determining whether relocation is in the child's best interest, courts must
"consider and give appropriate weight to all of the factors that may be relevant to the determination. These factors include, but are certainly not limited to each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements" (Matter of Tropea, 87 NY2d 727, 740-741).
Here, it is clear that both parents love their child, and that he loves and has a close relationship with both of his parents. However, the record supports Family Court's finding that, on balance, the child's best interests are served by granting the mother's petition. Family Court considered all of the relevant factors, including each parent's past performance, relative fitness, and their ability to guide and to provide for the child's intellectual and emotional development (id.).
It is undisputed that the mother has historically been the child's primary caretaker (see Matter of Chirag C. v Jaimie D., 226 AD3d 470, 471 [1st Dept 2024], lv denied 42 NY3d 907 [2021]), and has been instrumental in ensuring that the child received the best education that he could and the services that he needed, despite the father's initial objections. The child improved while in the mother's care to the extent that, by the time he was in second grade, he required fewer IEP services.[FN3] Furthermore, during the years that the mother had final decision-making authority under the parties' consent custody order, the father never sought to challenge any of her decisions in court.
The testimony and documentary evidence at trial supports Family Court's finding that the mother is more attuned to the child's academic and emotional needs (Matter of Keoshia R. v Lamont D., 191 AD3d 614, 614-615 [1st Dept 2021]). When the mother and the child's teachers wanted to have him evaluated for an IEP, the father initially resisted and told the mother that she was "the problem." Eventually, he agreed to the IEP evaluation.
The mother testified in detail as to the contents of each of the child's IEPs, his progress over the years, and the services he continued to receive at the time of trial. As the mother testified, and as the records in evidence demonstrate, the child has always "flourished" academically, but requires services at school and guidance from all of the adults in his life, including his parents, to assist him with his development in the "social aspect that he struggles with." The IEPs and report cards in evidence demonstrate that, to the extent that the child had any academic difficulties, they were directly related to his social and emotional issues, which impeded his ability to focus. The child's IEP in evidence from the most recent year he lived with his mother is consistent with her testimony that the child improved while in her care. It states that the mother "would like to consider a general education program [but continue the assignment of a paraprofessional to the child] 'because of what [the child] views as the difference between his level and the level of others.'" She recognized that the child had "definitely made a lot of progress in . . . how he deals with situations . . . [and] his self-control and self-monitoring skills have improved . . . [but] we still have a ways to go. How to speak to friends and that whole component." The mother's openness to considering a transition to general education, while maintaining the services that would help the child continue to improve behaviorally, reflects her ability to balance the child's needs and strengths and her validation of his feelings and experiences, including his desire not to feel different from his peers.
In contrast, the father listed the areas of concern for the child as "self-control, checking impulses, and thinking before you speak and act." He conceded that the child's social and emotional functioning continued to be of concern. The child's counselor stated that the child continued to require the smaller student-to-teacher ratio and paraprofessional services in his specialized class. Nevertheless, the father preferred that the child be in general education without a paraprofessional.
The evidence and testimony at trial demonstrated the father's tendency to address the child's behavioral and social issues by maintaining a predictable routine, using behavioral charts, and, when that failed, simply removing the child from school early. Generally, he did not appear to use an approach that more broadly addresses the child's social development and interactions with peers and adults other than the father. Despite the father's belief that his parenting style was more suited to the child's needs, he conceded that the child continued to exhibit problematic behavior while in his care.
The child's improvement in the mother's care and worsening behaviors while in the care of the father support Family Court's finding that, on balance, the mother's approach was better suited to the child's emotional, developmental, and academic needs.[FN4]
The testimony and evidence at trial also support Family Court's finding that the mother is the more likely of the two parents to facilitate and nurture the other parent's relationship with the child (see Keoshia R., 191 AD3d 614, 614-615; Chirag C., 226 AD3d at 471). Family Court based its finding in part on its observation of the parties' demeanor and presentation in court, to which we owe deference (see Michael Y. v Dawn S., 212 AD3d at 495).[FN5] Furthermore, during the mother's phone and video calls with the child, the father remained present and would frequently interject or end the call. In contrast, when the child was with the mother, she encouraged the child to speak freely and privately with the father. The father also interfered with the mother's visits in New York. For example, he denied her request to spend time with the child on his birthday weekend. On another occasion, when the mother arrived in New York on a Wednesday evening and wanted to spend time with the child beginning on Thursday, the father insisted she could not see him until Friday. The reason the father gave for refusing to allow the mother and child to spend time together in New York was that it would be a "disruption" to his routine.
The testimony and evidence submitted at the hearing further support the court's finding that the move to Florida would improve the child's overall quality of life,[FN6] and that the child's school in Florida will continue to provide the child with an IEP, as necessary.[FN7] The evidence demonstrated that the mother's home in Florida is safer than her previous home in the Bronx, is approximately 25 minutes from the school the child would attend in Florida with his stepsiblings, and provides the child with more advantages and opportunities for social engagement with his peers than he had while living with the father in Brooklyn. The mother's testimony about these facts was not disputed by the father.
In contrast, the father's claim that he was better able to address the child's behavioral issues than the mother is not supported by the record. At the time of trial, when the child temporarily lived primarily with his father, the child was not doing well emotionally or behaviorally in his school in New York. The father conceded that, during that period, the child continued to have behavioral problems, including fairly serious incidents in late 2022 and January 2023. The father admitted to the mother that the child's behavioral problems, including with the father, were worsening, and "they needed to do something."[FN8]
The child's most current IEP, covering the time the child lived with the father, recommended positive social experiences to help him continue to improve and grow his social skills, build friendships, and treat adults respectfully. However, the evidence at trial demonstrated that, while in the father's care, the child missed school-based counseling sessions and had fewer opportunities to interact with children his age, or anyone other than his father, than he has at the mother's home in Florida.
It is undisputed that the commute between the child's school and the father's home is over an hour long. As of May 2023, the father had brought the child to school late approximately 88 days, and he had 13 absences. As a result, the child missed counseling sessions and was prevented from socializing with his peers and participating in extracurricular activities. One reason the father gave for cutting short the mother's phone and video conversations with the child was that there was little time between arriving home from the long commute and the child's bedtime. The child had no friends in his father's neighborhood, did not socialize with school friends outside of school, had never had a playdate at his father's home, and spent most of his weekends, except for a Sunday basketball clinic, with his father preparing for the week ahead, doing tasks such as homework and laundry. Nevertheless, and despite the fact that the father conceded that a school in his neighborhood would provide the same IEP services, the father remained steadfast in his plan to keep the child in the same school until he aged out, and never explored whether there was an appropriate school closer to his home.
Even accepting the father's argument that the mother's move to Florida was motivated mainly by her desire to be with her new husband, this conclusion would not outweigh the fact that Florida provides the better home and social environment for the child. Moreover, the Court of Appeals has recognized that a parent's marriage to a new partner can be a valid motive for seeking to relocate, can create stability for a child, and "should not be summarily rejected . . . where the over-all impact on the child would be beneficial" (Tropea, 87 NY2d at 739). Here, the mother demonstrated at trial that granting her petition would provide the child with greater stability and an improved overall lifestyle without disrupting the child's relationship with the father. The Family Court found credible the mother's testimony that the child's needs would be served by spending the school year in a two-parent home with stepsiblings, where he would have additional adult guidance and relationships with stepsiblings that would foster his social and emotional development. There is no evidence in the record at all to suggest that the mother's desire to move was improperly motivated, for example, by "animosity toward the [father] or a desire to keep the child away from" the father (Matter of Adekunle D.D. v Luxury M.D., 234 AD3d 585, 587 [1st Dept 2025]). To the contrary, the mother recognized the value of the father in the child's life, and his strengths as a parent, and she remained committed, from the filing of her petition through the entry of the Family Court's order, to ensuring that they would continue to spend meaningful time together and continue their close relationship.
There is a sound and substantial basis in the record for Family Court's determination that the child's relocation to Florida will not have a strong negative impact on the father's access to the child (see e.g. Matter of Kevin McK. v Elizabeth A.E., 111 AD3d 124, 129-130 [1st Dept 2013]). Indeed, the father will have more time, and more extended time, with the child than he was permitted under the 2019 consent custody order. As the Court of Appeals has stated,
"[t]here are undoubtedly circumstances in which the loss of . . . weekend visits necessitated by a distant move may be devastating to the relationship between the noncustodial parent and the child. However, there are undoubtedly also many cases where less frequent but more extended visits over summers and school vacations would be equally conducive, or perhaps even more conducive, to the maintenance of a close parent-child relationship, since such extended visits give the parties the opportunity to interact in a normalized domestic setting" (Tropea, 87 NY2d at 738).
Here, the mother testified that the father had never even requested extended time with the child during his summer break. The father testified that he had never had the child stay with him for a full school break. Prior to August 31, 2022, except for a period during the pandemic when the child stayed with each parent for two weeks at a time, the father could recall only one occasion when he had the child with him for even one full week. In contrast, the modified order awards the father parenting time in New York during the child's spring break every year; all but the last two weeks of summer recess every year; Labor Day weekend every year; half of the winter break every year, including Christmas in odd years; and, in even years, Thanksgiving recess and the February mid-winter break. In addition, the father is awarded "liberal access" in Florida upon two weeks' notice to the mother. The modified order directs the mother to pay for the child's travel for the father's parenting time in New York, based on the mother's own proposal that she do so. Accordingly, it is clear that the court not only considered the impact of the child's move to Florida on his relationship with the father, but ensured that the father would have more, and more extended, parenting time than he had enjoyed under the previous order (compare Matter of Erica B. v Louis M., 218 AD3d 421, 423 [1st Dept 2023] [affirming denial of relocation petition where the mother's "unrealistic" proposed visitation plan would result in a reduction of the father's parenting time under the existing order and require the child to miss school on alternate Fridays]).
At the time of the hearing, the child expressed his preference for relocating with his mother to Florida, and the attorney for the child supported that position. Appellate courts may consider developments outside the record to the extent that they indicate that the appellate record is no longer sufficient for determining a parent's fitness and right to custody (Matter of Michael B., 80 NY2d 299, 318 [1992][reversing award of custody to foster parents as contrary to the Social Services Law and remanding for further proceedings to determine whether biological father was a fit custodian based on post-record removal of other children from his care for neglect]). Here, there is no indication that Family Court did not have sufficient information to determine custody. Even if this Court were to consider the child's change of preference since the time of the hearing, his preference would not be dispositive (see Matter of Susan A. v Ibrahim A.,
96 AD3d 439, 440 [1st Dept 2012]), particularly where, as here, the child's attorney described the child's reasons for his change of position as "questionable."[FN9] 
All concur except Kapnick and Pitt-Burke, JJ., who
dissent in an memorandum by Pitt-Burke, J.

PITT-BURKE, J. (dissenting)
 

A parent's request to relocate with the parties' child has been described as one of "the knottiest and most disturbing problems that our courts are called upon to resolve" (Matter of Tropea v Tropea, 87 NY2d 727, 736 [1996]). Foremost, a court's role in resolving immensely personal family matters of this nature is to ensure that the final decision is in the best interest of the child and that its findings have a sound and substantial basis in the record, as that is the sine qua non of any credibility determination (id. at 741; Matter of Salena S. v Ahmad G., 152 AD3d 162, 163 [1st Dept 2017]). Therefore, the threshold issue here is not whether the Family Court's credibility determinations should be disturbed as the majority posits. Rather, it is whether there is a substantial basis in the record to support the finding that granting the mother primary physical custody of the subject child and permission to relocate to Florida, served the child's best interest (see Tropea, 87 NY2dat 741). In my opinion, the Family Court's determination fails on both accounts, as the evidence clearly establishes that a predominant emphasis was placed on those facts and circumstances most likely to serve the mother's best interest, rather than that of the child, thereby undermining the exact premise set forth in Matter of Tropea (id. at 740-741). As the mother has failed to establish that it would be in the child's best interest to relocate to Florida under the factors set forth in Matter of Tropea (id.), I respectfully dissent.
This appeal concerns the modification of an existing custody agreement. The Family Court found that relocation of the child to Florida with the mother was in the best interest of the child, as she was more in tune with the child's educational and therapeutic needs and would ensure the father-son relationship would remain intact. In making its findings, the court set aside the father's testimony as less than credible. Therefore, I take this opportunity to put forth the facts of the father's case as set forth in the record and as relevant to those factors that should be considered under Matter of Tropea (id. at 739-741).
Background
The parties were never married but resided together with their now 11-year-old son until August 2015 when the mother and child moved out of the home when the child was one year old. Upon leaving the shared home, the mother and child primarily resided in the Bronx, but the father remained intensely involved in the child's life.
While in the mother's care, the child displayed behavioral issues which resulted in him being expelled from an afterschool program and two daycare programs. Concerned with the child's behavioral issues, the father petitioned the court for custody of the child believing his son would benefit from his alternative parenting style. Ultimately, the parties agreed to shared custody of the child, with residential custody remaining with the mother, and the father receiving visitation three weekends a month and on alternating holidays. As part of this custody agreement, and as expressly relevant here, the mother agreed not to move with the child outside of the New York metropolitan area. This schedule remained unchanged until the COVID-19 pandemic, when the child began living with each parent on an alternating two-week schedule. Change in Circumstances
In March 2021, the mother accepted a marriage proposal from her current husband who was unable to move out of Florida due to his own custody arrangement for his children from a prior relationship. As the mother's testimony makes clear, she knew that acceptance of the proposal would ultimately result in her moving to Florida to live with her husband. In fact, the mother's testimony establishes that she knew as early as June 2021 that she would move to Florida.
Yet not until five months later, in November 2021, did the mother notify the child and the father that she intended to move to Florida with the child. To facilitate the move, the mother proposed a visitation schedule that would significantly reduce the father's time with the child. Under the proposed schedule, the father would receive visitation one weekend every other month, school breaks, the entire summer vacation, and most holidays at the mother's expense. In response, the father proposed a visitation schedule that mirrored the schedule offered by the mother but allowed the child to remain in New York. The mother refused, contending she would be a better fit for the child. The father did not agree to the mother's proposed visitation schedule, so in May 2022, the mother filed the subject petition to modify the custody arrangement seeking permission to move to Florida with the child. In the petition, the mother cited her impending marriage and the purchase of a home in Florida as the change in circumstances warranting modification of the agreement. In support of her petition, the mother stated that the relocation was in the best interest of the child as Florida was a better and safer environment for her children,[FN10] and because the child would be enrolled in a better school, and would receive a better quality of life due to lower cost of living and crime rates in Florida.
During the pendency of the mother's motion, the court advised her that she could not move to Florida with the child until it made a final determination. Shortly thereafter, concerned that his child would be allowed to move to Florida, the father filed his own modification petition seeking residential custody of the child. In his petition, he alleged that a move to Florida would harm the father-son relationship, and the best interest of the child was served by remaining in New York where the child has lived his entire life. With her motion still pending, the mother proceeded to move to Florida, leaving her son behind with the father, prompting the court to enter a temporary order noting that the child was residing with the father while the mother retained parenting time over holidays. Education
During pre-k, the child's school suggested having him evaluated for an Individualized Education Plan (IEP) due to his behavioral issues. While the father was initially reluctant to have the child evaluated, he ultimately consented, and the child received speech and occupational therapy, counseling, and one-to-one paraprofessional services starting in kindergarten.
Upon the mother's relocation, the father kept the child in the same school he attended while living with the mother so the child could remain in a comfortable learning environment. As a result, the father commuted with the child an hour and 25 minutes on public transportation to school. Due to this commute, the child was often tardy,[FN11] but importantly, this tardiness was not unique to the father's supervision, as the child was tardy over 40 times in the second grade while living in the Bronx with the mother.
In the year immediately preceding trial, while the child resided with the mother, he was kicked out of an afterschool program due to this behavior. Then in January 2023, the child made a comment in front of his classmates which prompted the principal to suggest additional counseling and support services for the child. The father stated he would look into family therapy and advise the mother if her presence was necessary. Ultimately, the father chose not to pursue family therapy, but under his father's care the child's behavior improved overall. The child made significant improvements in the classroom and the school only called home on five occasions for the child's behavior. Based on the child's progress, the school advised that he could join the general education environment. However, the father opted to have the child remain under his IEP with a one-on-one paraprofessional until there was consistent improvement in the child's behavior. The father also ensured that the child completed his homework every night, enrolled the child in an afterschool program, and consistently attended parent-teacher conferences. Pending Relocation Hearing
The father has been employed by the New York City Department of Probation for over 20 years. He lives alone in a two-bedroom apartment in Brooklyn, where the child has his own room.
When the mother voluntarily moved to Florida during the pendency of her relocation petition, she was aware that the child would not be joining her. However, the father ensured the parenting relationship remained intact, that the child spoke with the mother daily, and if necessary, that he was removed from school early to travel to Florida and visit her.
While residing in Florida, the mother traveled to New York to visit the child one weekend a month and noted infrequent issues while exercising those visits. Despite the mother's testimony to instances in which the father prevented the mother from removing the child from school when she visited, the father's testimony establishes that his unwillingness to allow the mother to disrupt the child's routine grew out of his belief that the child benefited from a consistent routine to address his behavioral issues.
As it relates to economic necessity, while residing in New York, the mother worked as an occupational therapist making $79,000 per year until she was let go in April 2021, a month after she accepted the marriage proposal of her now-husband. The mother then obtained a remote position as an occupational therapist in New York making $64 per hour, a position she maintained after her move to Florida. While residing in Florida, the mother initially retained a position as an occupational therapist making $79,000 per year. However, she resigned after three months and ultimately took a part-time position making significantly less.
Regarding the child's educational needs and IEP, the mother testified that she called the Florida school to discuss the IEP but indicated that she did not take further steps to set up an in-person meeting, provide the school district with the child's IEP, or see if the school could accommodate the child's current IEP.
Finally, while the mother's Florida residence was a four-bedroom house, she testified that if the child were to relocate to Florida, he would share a room with his stepbrother, with whom all parties agree he does not get along. Family Court Decision
In October 2023, the Family Court entered an order granting the mother primary custody and permission to relocate with the child to Florida. As to the father's visitation, he was granted parenting time every Labor Day weekend, every school spring break, alternating Thanksgiving and mid-winter recesses, and the entire summer break. The parties were both awarded full and independent access to the child's educational and medical records.
On November 27, 2023, the Family Court amended its October order and awarded the mother final decision-making authority in possible instances of disagreement between the parties. In its November decision, the court found the father's testimony less than credible and self-serving, while it found the mother's testimony consistent and fully credible. The court also found that the relationship between the parties was "less than amicable," hindering their ability to effectively communicate. Despite testimony regarding hostility from both parties, the court found that the father's hostility toward the mother rendered her better equipped to facilitate a relationship between the father and child. The court, acknowledging its in camera review of the child, stated that the child's position remained consistent in his desire to reside with his mother in Florida. The court noted it awarded the child's preference "great deference," and found it in the child's best interest to grant the mother's relocation petition and to grant her primary physical custody of the child.[FN12]
Discussion
A modification to an established custody arrangement must be handled in a manner that ensures the final decision is in the child's best interest (Matter of Tropea, 87 NY2d at 741). While it is for the Family Court to determine whether the proposed relocation would serve the child's best interest, its determination must consider all the proof submitted and must have a sound and substantial basis in the record (id. at 739-741; Matter of Salena S., 152 AD3d at 163).
The majority, in its constrained review of the record, focuses on the court's credibility determination and disregards both undisputed and documentary evidence that is contrary to its position. In fact, when reading the majority's opinion, one might think the father bore the prima facie burden here.[FN13] However, a credibility determination against the father does not negate the mother's requirement, as the petitioner, to meet her prima facie burden in the first instance, a burden the majority fails to demonstrate has been satisfied.
When a parent seeks permission to relocate, they must make a prima facie showing that there has been both a change in circumstances requiring relocation and that the relocation is in the best interest of the child (Matter of Erica B. v Louis M., 218 AD3d 421, 422 [1st Dept 2023]). Based on the record before this Court, I find that the mother did not make a prima facie showing on the latter.
Under Matter of Tropea, the court must consider and weigh various factors when determining whether a relocation would serve the child's best interest. These factors include, but are not limited to, the reason for the move, whether the move is economically necessary, the relationship between the child and the parents, and the impact on the quality and quantity of contact with the noncustodial parent (see Matter of Tropea, 87 NY2dat 740-741).
As relevant here, the mother's statements, which serve as the only evidence in support of a large portion of her petition, are insufficient to satisfy her prima facie burden. In my view, the mother failed to demonstrate that the move was for the purpose of enhancing the child's life, that it was born out of economic necessity, or that the benefits of the move outweighed the disruption of the child's relationship with the father. Furthermore, by discounting the father's testimony, the court failed to sufficiently consider the impact of the relocation on the quality and quantity of contact with the father and child. In short, the court took the mother's word at face value and discounted the father's testimony to the detriment of the father-son relationship.
While the court opined that relocation to Florida was is in the best interest of the child because the mother was more in tune with the child's educational needs, the mother would better facilitate a relationship between the father and child, and the move would improve the child's life educationally and emotionally, these findings lack support in the record. In fact, none of the propositions set forth by the mother have a sound and substantial basis in the record.
To that end, the mother failed to show the reason for the move was the enhancement of the child's life (id. at 740-741). Although the mother knew she would be moving to Florida to join her husband as early as June 2021, she neglected to inform the father or the child until November 2021. Similar to her unilateral decision to move, she also failed to consult the child's school, IEP paraprofessional, or counselor to get their input on the impact her leaving during the pendency of the action and ultimate relocation to Florida would have on the child. Although the mother states that the relocation to Florida was to provide the child with a better living environment, she both purchased and moved into her home in Florida during the pendency of her petition even though she was unaware at that time whether her son would be able to join her.
The mother also failed to establish that the move to Florida was economically necessary (id. at 739, 740-741). In New York, the mother worked as an occupational therapist making $79,000 per year prior to being let go in April 2021. Although the mother stated she could not find similar work after losing her job, it is noteworthy that she lost her job in New York a mere month after accepting the marriage proposal of her then-fiancÉ, and retained a remote position in New York, making $64 per hour, prior to her move. Upon moving to Florida, she found work as an occupational therapist making $79,000 per year. However, she resigned from that position after three months and began working a part-time job in Florida, significantly reducing her yearly earnings to $55,000. In light of these facts, the mother has failed to demonstrate that the relocation to Florida arose out of economic necessity.
The mother also failed to submit adequate proof to demonstrate that the "relocation would outweigh the disruption in the child's relationship with the father" (Matter of Erica B., 218 AD3d at 423). In Matter of Erica B., this Court found that the mother failed to demonstrate that a move would be in the best interest of the child where she petitioned the court to relocate to Rochester because she was unable to afford to live in New York City (id.). The mother found a home in the suburb of Rochester and stated the move would enhance the child's education and economic condition (id.). The mother testified that the father and child had a great relationship and proposed a visitation schedule where the father would have the child during summer break and one weekend every month (id.). She testified that she would facilitate these visits by driving the child 5 ½ hours each way under this proposed visitation plan (id.). However, this Court found that the mother failed to substantiate her claims and did not show that the benefits of the relocation would "outweigh the disruption in the child's relationship with the father" (id.).
As in Matter of Erica B., the mother failed to show that the benefits of the relocation would outweigh the disruption in the child's relationship with the father, as it is undisputed that the father is a present and integral part of the child's life. For example, the father testified that while he had residential custody of the child, he gave him a "pep talk" as he walked to school every morning. The father ensured that the son attended basketball camp on Sundays due to his interest in the sport. Notably, however, unlike in Matter of Erica B., here, the relocation of the child is not a mere 5 ½ hour drive but rather several states and several hours of travel by airplane away.
It is also clear that the court did not adequately consider the impact of the relocation on the relationship in terms of the quality and quantity of contact between the father and child (see Matter of Doreen F. v Fabricio M., 176 AD3d 563, 564 [1st Dept 2019]). On this point, Matter of Doreen F. is instructive.
In Matter of Doreen F., the mother had primary custody of the children while the father had liberal visitation every other weekend, and weeklong visits during school breaks (id.). The mother petitioned to relocate with the children to Florida to reside close to family to help with childcare (id.). The father opposed the petition, contending that the relocation would limit the quality and quantity of his contact with his children even with a generous visitation schedule (id.). This Court found that "any quality-of-life advantage realized by the relocation would not necessarily outweigh the disruption in the children's relationship with their father" (id.).
As in Matter of Doreen F., here it is undisputed that the father and child enjoy a close loving relationship. Not only was the father an integral part of the child's life, but he acted as the child's primary parent for over a year while the mother voluntarily removed herself from New York during the pendency of her petition.
Prior to the mother's relocation, the father had visitation three weekends a month and alternating holidays—a schedule that resulted in no more than twelve days passing between the father's parenting time with the child. When compared to the current order, the father's visitation is sorely lacking as significant time, sometimes months, are to pass between parenting time.[FN14] Additionally, the different school year schedules for New York and Florida would likely impinge on the father's meaningful parenting time with the child in the summer. As the mother concedes, the school year in Florida ends earlier than summer camps in New York begin. Therefore, her mother and sister would have to help accommodate the parenting arrangement or the child would have to stay in Florida with the mother longer to accommodate the gap, further diminishing the father's parenting time. Thus, it is clear the relocation advantage here does not outweigh the impact to the quantity and quality of the contact between the father and child.
Further, the court's conclusion that the father would not ensure the mother-son parent relationship remained intact if awarded residential custody is belied by the record (cf. Matter of Alfredo J.T. v Jodi D., 120 AD3d 1138, 1139 [1st Dept 2014]). Although a custodial parent is tasked with encouraging and facilitating a meaningful relationship between the child and the noncustodial parent (see Bliss v Ach, 56 NY2d 995, 998 [1982]), the inability of coparents to put their hostility towards each other aside to prioritize the child is just one factor courts consider when making custody determinations (see Matter of Alfredo J.T., 120 AD3d at 1139 [awarding custody of the child to the father due to the mother's deliberate disparagement and hostility towards the father in front of the child]).
Here, unlike in Matter of Alfredo J.T., the mother testified to disrespect and insults from both parties but noted these incidents did not take place in front of the child. More importantly, however, in making its determination the court seemingly ignored the mother's testimony of the disrespect by both parties, and only credited the disparagement to the father.
There is also no evidence in the record to suggest that the father failed to allow the mother access to information regarding the child's education while he resided with the father. In fact, the mother's own testimony demonstrates that she was able to obtain the child's educational information from both the school and the father.
Contrary to the court's finding, the record also demonstrates that when the father maintained primary custody of the child, the mother spoke with the child daily on the phone. Though the mother expressed the father's initial contention regarding these phone calls, the court seemingly disregarded the mother's testimony as to the father's improvement, and there is no basis for the majority's assertion that such disruptions happened frequently. Conversely, when the child visited the mother in Florida, she did not ensure the father-son parenting relationship remained intact. The mother failed to designate a time for the father to call the child, resulting in the child sometimes being out of the mother's reach when the father called to speak to him and the father having to call other persons to contact the child.
The majority also asserts that the father failed to adhere to the child's routine. However, this finding is belied by the record, because while residing with the father, the child left school early on only two occasions, and only to facilitate traveling to Florida to visit the mother. In fact, the father expressed concern with the mother removing the child from school while visiting based on a reluctance to disrupt the child's routine, and not hostility towards the mother. Although the Family Court accorded the father's reasoning little to no weight, and instead found that he would not encourage a meaningful relationship between the child and mother if awarded residential custody, there is no evidence in the record to support the father's failure to adhere to the child's routine. Rather, as evinced by the mother's testimony, the record supports a finding that the mother was willing to disrupt the child's routine and school day to facilitate her visits to New York.
The majority's further finding that the father's failure to place the child into therapy after the January 2023 incident at school signaled that granting residential custody to the mother was in the child's best interest is misguided. Not only was this suggestion made by a person unqualified to make such a determination, but standing alone, it is insufficient to support a finding in support of the mother (Salena S., 152 AD3d at 163). Similarly, the Family Court's finding that the father failed to include the mother in therapy is equally unavailing, as the child was never enrolled into therapy for her to have been excluded.
Additionally, the court's finding that the mother was more in tune with the child's educational needs and that the child's life would improve educationally due to the move lacks support in the record (Matter of Tropea, 87 NY2d at 740-741). Notably, there is no evidence in the record, outside of the mother's testimony, that the education the child would receive in Florida would be equal to or better than the one he would receive in New York.[FN15] As noted above, when asked about the IEP services, the mother testified that she called the Florida school regarding the IEP but did not set up an in-person meeting to discuss the IEP, the services available, or send the school the child's IEP to review. The mother also failed to provide any supporting evidence as to the IEP services available to the child at the school in Florida or whether the school could accommodate the child's current IEP. The mother acknowledges her belief that the Florida school would make its own IEP determination as to the child, including a determination to minimize, change or cancel the plan. Therefore, the record demonstrates that the mother was unaware if the child's current IEP could be continued in Florida and acknowledged that she had not brought the child to the Florida school for an evaluation at any time before or during the pendency of this action. Yet, the court somehow determined that the Florida school was better for the child.
The Family Court also improperly credited the father's initial reluctance to have the child evaluated for an IEP in kindergarten as him being less in tune with the child's educational needs now that he is in fifth grade. In doing so, the court ignored other aspects of the record which clearly demonstrate that the father's stance regarding the child's IEP had evolved over the years. As noted above, when given the opportunity for the child to return to general education the father opted to have the child remain under his IEP with a one-on-one paraprofessional as he desired consistent improvement in the child's behavior before he was moved into general education.
Similarly, the majority uses the child's IEP as a means to improperly depict the father as someone unequipped to address his child's educational needs.[FN16] For example, the majority focuses on the child's February 2022 IEP in support of its assertion that the mother was more in tune with the child's educational needs. However, the majority seemingly disregards the 2023 IEP, which is not only the most recent IEP in the record, but correlates to the school year the child resided with the father, and notes that the parents, who were both present at the meeting concerning the IEP, found that the paraprofessional "significantly supports [the child]'s pro-social and safe behavior in the classroom."
The majority also attempts to supplement the mother's testimony concerning the child's IEP in Florida, relying exclusively on an argument and federal statute outside the record on appeal. However, as noted above, the mother's testimony only recounts her single conversation with the school in Florida, her decision not to have the child interviewed for an IEP, and her belief that the Florida school did not have to adhere to the New York IEP recommendations. Thus, the only consideration before this Court is whether the mother, whose testimony simply indicates that the Florida school would review the IEP and reserved the right to determine if or what services the child would receive, has established that the move was in the best interest of the child. Based on this testimony alone, the mother failed to demonstrate that the relocation to Florida would enhance the child's education.
The majority also highlights the child's history of tardiness while residing with the father. However, much like the Family Court, it fails to acknowledge that this tardiness is not unique to the father, as the child was late to school over 40 times while residing with the mother in the Bronx. While the tardiness is better explained under the father's supervision, in that the child commuted from Brooklyn to Harlem to attend school once the mother voluntarily removed herself from New York, and that the father wanted the child to remain in a familiar learning environment, the majority attempts to discount the father's prioritization of the child's comfort over his own convenience. This error is indicative of the overarching theme of the majority's position; it construes even the father's seemingly positive attributes in the negative, skewing the record toward the outcome it deems appropriate while disregarding contradicting evidence in the process.
Lastly, while the attorney for the child (AFC) advocated for the granting of the mother's relocation petition during the hearing, on appeal the AFC passionately argues for the reversal of the Family Court's order. The AFC's change in position stems from the child's expressed desire to remain in New York after spending the summer of 2023 in Florida after the hearing. The child's position has remained consistent, and, in an October 2024 interview, the child reiterated his desire to move back to New York with his father because he does not get along with his stepbrother, with whom he shares a room, and would like to reunite with his friends at his school in New York. The AFC's position also highlights a shortcoming of the Family Court's determination—namely, that the mother's sole basis for believing her son would like to move to Florida was that he enjoyed vacationing there.
Nevertheless, as stated by the Family Court in its November order, the desire of a child should be awarded great deference when deciding custody (see Matter of Tropea, 87 NY2d at 739 ["the rights and needs of the children must be accorded the greatest weight . . . ."]). While I do not contend that every change in position by a child requires reversal of a Family Court order, here, the child's change in position, which remained consistent after residing in Florida, further magnifies the court's failure to ensure that its decision was in the child's best interest.
This is not often the story that emerges from custody disputes of this kind. The father here was an integral part of the child's daily life and the father-son relationship was detrimentally disrupted. Though the parties are no longer together, there is no evidence in the record that their relationship has affected their individual relationships with the child. Therefore, the court, by relying solely on the mother's testimony, made a finding not supported by the record before it.
Much like the Family Court, the majority's review of the record disregards contradicting evidence and even asserts hypotheticals to bolster the record in the mother's favor. In my view, the mother's petition falls short of meeting her prima facie burden and instead the record demonstrates that the mother's choice to move to Florida stems from the desire to enhance her life, rather than the life of the child. Accordingly, as the mother did not meet her burden to demonstrate that the relocation was in the
child's best interest and the record lacks evidence outside of her own testimony, I would reverse the order granting relocation and deny the mother's petition.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 14, 2025

Footnotes

Footnote 1: The dissent focuses on the timing of the mother's conversations with the father and child about her decision to move to Florida. We notethat the mother responded to the child's questions without promising or encouraging a particular outcome. We find that her thoughtful response is more indicativeof the appropriateness of the mother's parenting than is the date on which she told the father or child she had decided to move. Furthermore, the dissent mischaracterizes the mother's testimony. The mother testified that she had discussed her decision with the father and her fiancÉ first. Then, in or about October or November 2021, in response to the child's questions, she told him, in sum or substance, "mommy's going to be moving . . . to Florida."

Footnote 2: Contrary to the dissent's assertion, none of the briefs on appeal claims that Family Court's order addressed only the mother's petition. The record, compiled by counsel for the appellant father, includes only the final order after trial containing the docket number for the mother's petition. However, it is clear from the Family Court's Decision Upon Fact Finding and from the transcript of the first and last day of trial (discussing the "modification petitions") that the court considered and decided both parties' petitions. Accordingly, we respectfully disagree with the dissent as to the parties' respective burdens to establish the facts alleged in their respective petitions. For the reasons set forth in this order, we also respectfully disagree that the mother failed to satisfy her burden.

Footnote 3: The dissent is critical of the mother because she did not consult with an educational or psychological professional about the impact of moving to Florida on the child or show his IEP to anyone at the school he would attend in Florida if her petition were granted. However, there is also no evidence that the father consulted with anyone about the impact on the child of the mother's move or a change of primary custody to the father if his petition were granted. Nor did the Family Court or any of the attorneys suggestthat a forensic evaluation was necessary in this case.

Footnote 4: While we agree that the record demonstrates that the child continued to do well academically in the father's care, we disagree to the extent that the dissent asserts that the record supports a finding that his behavior improved while living with the father or that his teacher recommended transition to the general education environment. To the extent that the dissent relies on the father's testimony, it does not support this claim. He testified that the child's teacher stated that, "academically, he was strong enough to go into a general education class" (emphasis added). However, the father further testified that everyone, including the child's teacher and the mother, agreed that the child needed to continue with the IEP services that support his social development. This is also borne out by the most recent IEP in evidence.

Footnote 5: We disagree with the dissent that the court failed to take into account that both parties had difficulty communicating with each other. While the mother acknowledged that, "[u]nfortunately, [the parties] have not had an amicable relationship or communication . . . [m]ostly in regards to when it comes to [the child]," she also testified that the father would curse at her and call her names when they disagreed. The father conceded that the mother did not speak that way to him. On one occasion, the father took the child to a doctor appointment and, when the mother arrived, stormed out with the child although the child had not yet seen the doctor. Accordingly, the court's observation that the father exhibited "disdain and hostility" toward the mother is supported by the record.

Footnote 6: We note that the Court of Appeals expressly rejected a requirement that the parent seeking relocation demonstrate economic necessity (Tropea, 87 NY2d at 738). Our dissenting colleagues focus on the fact that, at the time of trial, the mother's annual income was less than it was in New York. However, that constrained view fails to acknowledge the vast improvement in lifestyle that the mother testified about as a result of moving to Florida, which the father did not dispute at trial. Her employment in Florida allows her to set her own work schedule and to work partly from home. Her husband is also employed full-time, working largely from home, as a long-term medical insurance case manager. The apartment that she and the child resided in in the Bronx was in a crime-ridden neighborhood where she never felt it was safe for the child to play outside. At his father's apartment in Brooklyn, the child had no friends and rarely left the apartment except to commute to school or basketball clinic. In contrast, in Florida, the mother and her husband together own a newly built two-story, four-bedroom house with front and back yards in a neighborhood where they know their neighbors well and neighborhood children play safely outside. Because the child loves basketball, there is a basketball hoop for him in the front yard. He also has a scooter that he rides with his stepsiblings and the other neighborhood children. At his request, the mother planned to purchase a bicycle for him for his birthday to learn to ride. The mother also testified that she was willing and able to afford to pay for the child to visit the father in New York during the child's school breaks, holidays, and some weekend visits during the year. She further testified that she had just accepted a position as an occupational therapist in an assisted living facility at $50 per hour, beginning with approximately 5-10 hours per week and increasing as her caseload increased. This would be in addition to her then $55,000 annual income.

Footnote 7: To the extent that the dissent contends that the child might not have IEP services available to him in Florida, we note that local school districts are required by federal law to provide children who transfer from a school in another state where they had an IEP to provide "services comparable to those described in the previously held IEP, in consultation with the parents" (20 USC § 1414[d][2][C][i][II]). The mother testified that she had visited the Florida school, spoken with an administrator there, confirmed that it has paraprofessionals and counselors, and that, since those items were included in his IEP, he would continue to receive those services.

Footnote 8: As Family Court found, as a result of the child's worsening behavior problems, the father "conveyed to [the mother] that he would look into family therapy, but that [the mother] 'was not needed.'" The child's school counselor, in the then current IEP in evidence, recommended counseling in the community, in addition to the group and individual counseling he received at school. Nevertheless, contrary to the dissent's statement, the fact that the father never commenced family therapy was not a basis for Family Court's award of custody to the mother. Nor is it the basis for our affirmance. Rather, Family Court cited the father's disregard of the value of the mother's participation in addressing the child's behavioral issues as one of several examples of the father's tendency to sideline the mother.

Footnote 9: The reasons listed by the attorney for the child included not being able to play video games of his choice or watch whatever he wanted on television, that he didn't like to do chores or go to church, as his mother required, and that his stepbrother is "annoying." Counsel also noted that the child stated that he had made new friends in Florida but hadn't known them as long as he had known his friends in New York.

Footnote 10: Though the mother asserts that she moved to Florida seeking a better living environment for her "children," it is important to note that the mother's other minor child resided in North Carolina with his father, and not with the mother.

Footnote 11: The majority misstates the number of times the child was tardy as 88; the documentary evidence establishes that the child was tardy 77 times while commuting from Canarsie, Brooklyn to Harlem.

Footnote 12: On December 8, 2023, this Court denied the father's November 29, 2023 petition.

Footnote 13: Although the father filed a cross-petition, contrary to the majority's interpretation, the plain language of both the October 2023 order and November 2023 amended order indicate that the court only addressed the mother's petition.

Footnote 14: The visitation schedule in the court's order grants the father parenting time for six weeks of summer vacation, spring break, Labor Day weekend, half of winter break, and alternating Thanksgiving and mid-winter breaks, ensuring there would be extended time, sometimes months, between visits, impacting the quality and quantity of contact between father and son.

Footnote 15: The mother's petition also noted the lower crime rate in Florida as a reason that the relocation would be in the child's best interest, but again, she failed to include any evidence to support this assertion. 

Footnote 16: Contrary to the majority's assertions, there is evidence in the record that there was an improvement in the child's behavior while residing with the father. The father testified to receiving only five phone calls home regarding the child's behavior, the mother testified to an improvement in his behavior, and there are messages from the child's teacher which note his improvement. In contrast, in the year immediately preceding trial, the child, while residing with the mother, was removed from an after-school program due to his behavioral issues.